IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| NORTH ALLEGHENY, SCHOOL DISTRICT | ) ) ) | CIVIL DIVISION |
| Plaintiff/Petitioner, | ) ) | |
| v. | ) ) | NO: 2:05-cv-2025 |
| J.S, a minor student, by and through her parents, K.S. and B.S. | ) ) ) ) | 2:20cv242 |
| Defendant/Respondent. | ) ) | |

## COMPLAINT

AND NOW, comes the Plaintiff/Petitioner, North Allegheny School District ("District"), by and through its attorneys, Alfred C. Maiello, Esquire, Stephen P. Engel, Esquire, Christina L. Lane, Esquire and Maiello, Brungo & Maiello, LLP, and files the within Complaint, averring as follows:

## I.     PRELIMINARY STATEMENT

1.     This is an action by the Plaintiff/Petitioner, a Pennsylvania public school district, pursuant to the Individuals with Disabilities Education Improvement Act of 2004 ("IDEA"), 20 U.S.C. §1400 *et seq.,* its implementing regulations, 34 C.F.R. Part 300, and 22 Pa. Code Chapter 14, as an appeal from the final administrative decision dated November 18, 2019. The North Allegheny School District challenges the determination of the Special Education Due Process Hearing Officer awarding J.S. full days of compensatory education for each day the District was in session from April 30, 2017 through September 27, 2017 and awarding K.S. and B.S. ("Parents") tuition reimbursement for J.S's placement in a private therapeutic boarding school located in the State of Utah.

## II.     JURISDICTION

2.      This Court has original jurisdiction pursuant to federal question jurisdiction, 28 U.S.C. §1331 and 1343.

3.      Plaintiff has exhausted its administrative remedies where required under 20 U.S.C. §1415(j). The District as the aggrieved party has brought this action ninety days from the date of the decision of the hearing officer.

4.      This Court has jurisdiction to correct errors of law made by a Pennsylvania Due Process Hearing Officer pursuant to the express authorization in IDEA, that any party aggrieved by the findings and decisions of an administrative proceeding shall have the right to bring a civil action in a district court of the United States, without regard to the amount in controversy.

5.      Venue is appropriate in this District pursuant to 28 U.S.C. §1391.

### III.      PARTIES

6.      Plaintiff/Petitioner, NORTH ALLEGHENY SCHOOL DISTRICT ("District") is a public school district created and operated pursuant to the Public School Code of 1949, as amended, 24 P.S. § 1-101 *et seq* having its principal place of business at 200 Hillvue Lane, Pittsburgh, PA 15237.

7.      Defendants/Respondents, J.S., is a 17 year-old student who currently resides with her parents K.S. and B.S. within the boundaries of the North Allegheny School District.

### IV.      ADMINISTRATIVE PROCEEDINGS

8.      At the time of the Administrative Proceeding J.S. was attending a private therapeutic boarding school located in Utah as a result of a unilateral placement by her parents.

9.      For the statutory relevant time period of two years from the date of filing, J.S. was enrolled in the District schools from January 28, 2017 through the November 28, 2017.

10.     J.S. attended a private placement at the Total Learning Center at parents' expense and as a result of a unilateral placement from November 28, 2017 through June 4, 2018.

11.     Defendants did not provide notice to the District of their intent to enroll in the private placement at the Total Learning Center.

12.     The unilateral placement at the Total Learning Center was held to be an inappropriate placement by the Hearing Officer and thus tuition reimbursement was properly denied.

13.     Following the unilateral placement at the Total Learning Center, parents placed J.S. in a therapeutic residential treatment program ("RTF") in Connecticut based on recommendations from mental health professionals.

14.     J.S. resided in the RTF in Connecticut from July 24, 2018 through August 3, 2018.

15.     Again, Defendants did not provide notice to the District that J.S. was enrolled in an RTF for mental health treatment.

16.     The RTF placement occurred over the summer months was covered by medical insurance and Parents did not seek tuition reimbursement for this medical placement.

17.     Following release from the RTF at parental request, J.S. was enrolled on August 3, 2018 in a therapeutic boarding school in the State of Utah and remained in the placement through the Administrative Proceedings.

18.     J.S. did not return to the District for the beginning of the 2018-2019 school year.

19.     The Parents never provided notice to the District of their intent to enroll their daughter in a private school and seek tuition reimbursement.

20.     The Parents initiated the Administrative Proceeding by filing a complaint on January 28, 2019.

21.     This filing placed at issue events occurring two years prior to the filing of the Due Process Complaint of January 28, 2109.

22.     Parents filed an Amended Complaint on April 18, 2019 withdrawing a claim for tuition reimbursement for the RTF placement.

23.     The Due Process hearing was conducted before Hearing Officer Brian Jason Ford and convened on July 15, 2019.

24.     At the initiation of the Hearing Officer Ford, the parties agreed to work together to submit a Joint Stipulation of Fact as the Hearing Officer did not find there was dispute of what occurred but dispute on the law to those facts.

25.     The hearing convened again on September 23, 2019 for Parents' submission of testimony regarding the current status of J.S. in her private school and their decisions to unilaterally place J.S. following withdraw from the District in November 2018.

26.     The Hearing Officer issued a decision dated November 18, 2019 (attached hereto as Exhibit "A"), in which he found the District violated J.S.'s right to FAPE and awarded J.S. full days of compensatory education for each day that the District was in session from April 30, 2017 through September 27, 2017; denied compensatory education for any other period of time; denied tuition reimbursement for J.S.'s placement in Total Learning Center; awarded tuition reimbursement for J.S.'s placement in the private therapeutic boarding school in Utah including tuition, room and board but denying related costs such as transportation and finding the District did not act with deliberate indifference.

## V.  STATUTORY AND REGULATORY BACKGROUND

27.     The IDEA and state and federal regulations require school districts to locate, identify and evaluate children with disabilities who need special education and related services. 20 U.S.C. §1412(a)(3); 34 C.F.R. §300.111(a); 22 Pa. Code §§ 14.121-14.125.

28.     Child Find is a term of art describing a school's obligation to locate, identify and evaluate.

29.     Child find is a positive duty requiring a school district to begin the process of determining whether a student is exceptional at the point where learning or behaviors indicate that a child may have a disability. Ridgewood Bd. of Educ. v. M.E. 172, F.3d 239 (3d Cir. 1999)

30.     Children who are suspected of having learning disabilities are entitled to some of the IDEA's protections with respect to discipline and due process rights to challenge eligibility decisions of a school district.

31.     In order to be eligible for benefits under the IDEA, a student must have a qualifying disability, and have a need for special education and related services.

32.     The adequacy of a school district's evaluations can only be determined at the time the results are offered to the student, not at some later date. H.D. ex rel. A.S. v. Cent. Bucks Sch. Dist. 902 F. Supp 2d 614, 624 (E.D. Pa. 2012).

33.     When a parent removes a child from special education all special education programs and services cease. The child is no longer identified as a child with a disability. The student is considered general education and is treated in the same manner as any other nondisabled child. Importantly, the District is not considered to have knowledge that the child is a child with a disability who needs special education.

34.     A child who has not been determined to be eligible for special education and related services, may assert protections under IDEA if the school district is deemed to have knowledge. A school district may be deemed to have had knowledge that the student was a child with a disability if: 1) if the student's parents expressed to the teacher or to the supervisory or administrative personnel a written concern that the child was in need of special education and related services; 2) the student's parents requested an evaluation; or 3) the child's teacher or other school district personnel expressed specific concerns about a pattern of behavior demonstrated by the child. 20 U.S.C. §1415(k)(5); 34 C.F.R. §300.534.

35.     There are limitations to a child receiving a "thought to be eligible" designation. A school district is not deemed to have knowledge if the parent of the child: (i) has not allowed an evaluation of the child or has refused services under this part or the child has been evaluated for special education services and was found to not be eligible is not a "thought to be" eligible student. 34 C.F.R. §300.534 (c)(2).

36.     A school district is obligated to offer a placement and an IEP to a child that is reasonably calculated to enable the child to receive meaningful educational benefit. Board of Education v. Rowley, 458 U.S. 176 (1982).

37.     'Meaningful benefit' means that a student's program affords the student the opportunity for "significant learning" Ridgewood Board of Education v. N.E., 172 F.3d 238 (3rd Cir. 1999), not simply de minimis or minimal education progress. M.C. v. Central Regional School District, 81 F.3d 389 (3rd Cir. 1996).

38.     Whether it is calculated to enable meaningful benefit is determined in relation to the child's intellectual potential. Ridgewood Bd. of Education v. N.E., 172 F.3d 238 (1999).

39.     The Circuit Courts have consistently held that the substantive standard for determining whether a child has received FAPE under IDEIA is that the educational program doesn't have to be the "best" program. M.M. v. Sch. Bd. 437 F.3d 1085 (11th Cir. 2006); (see also Fuhrmann v. E. Hanover Bd. of Educ., 993 F.2d 1031 (3rd Cir. 1993) in which the Court opined that the IEP not only need not be the best program, but it does not need to be superior to alternatives as long as it is calculated to enable the child to receive meaningful benefit from the program.)

40.     Tuition reimbursement claims by parents of "children with disabilities" are subject to the well-settled test set forth in the United States Supreme Court's decisions in Florence County School District v. Carter, 510 U.S. 10 (1993) and School Committee of Burlington v. Department of Education, 471 U.S. 359 (1985) (the "Burlington –Carter" test).

41.     The first step is to determine whether the program and placement offered by the school district is appropriate for the child.  The second step is to determine whether the program obtained by the parents is appropriate for the child. The third step is to determine whether there are equitable considerations that counsel against reimbursement or affect the amount thereof. Lauren W. DeFlaminis, 480 F. 3d 259 (3d Cir. 2007).

42.     If the first two prongs are met tuition reimbursement is an appropriate remedy, but reimbursement may be reduced or denied fully based on equitable considerations. This is the court's third and final inquiry with respect to tuition reimbursement. This inquiry aligns with the statute's express limitations on reimbursement if there are certain equitable findings. 20 U.S.C. § 1412(a)(10)(C)(iii).

43.     The Third Circuit, in circumstances dealing with the appropriateness of an IEP, has indicated that failing to place the educational problem at issue with the school for more than a year is unreasonable. _Bernardsville Bd. of Educ. v. J.H.,_ 42 F.3d 149, 158 (3d Cir. 1994).

44.     In Bernardsville the court explained the right of review contains a corresponding duty parental duty to unequivocally place in issue the appropriateness of an IEP. This is accomplished through the initiation of review proceedings within a reasonable time of the unilateral placement for which reimbursement is sought. A reasonable time period has been held to be one year, without mitigating excuse.

45.     Although the IDEA was amended in 2004 to include an explicit two-year statute of limitations for due process complaints, 20 U.S.C. § 1415(f)(3)(C), courts have used the reasoning in Bernardsville to deny tuition reimbursement claims on equitable grounds. E.g., Mittman v. Livingston Twp. Bd. of Educ., No. 09-4754 (DRD), 2010 WL 3947548, at *5 (D.N.J. Oct. 7, 2010).

46.     The IDEA allows a district court to reduce or deny any award if: (1) the parents failed to reject the school district's placement and indicate their intent to make a private placement.

47.     Tuition reimbursement may be denied "upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. §1412(a)(10)(C)(iii)(III).

48.     Tuition reimbursement claims may be denied for a parents' failure in providing the school district adequate notice. 20 U.S.C. 1412(a)(10)(C)(iii)

49.     In particular, the Supreme Court has emphasized that courts should consider whether the parents failed to give adequate notice of their intent to enroll the child in private school as an equitable factor in its determination. "In considering the equities, courts should generally presume that public-school officials are properly performing their obligations under [the] IDEA."

50.     The unilateral placements are a departure from the cooperative placement process [preferred by IDEA], and an out-of-state unilateral enrollment is a greater departure. Great Valley School District v. Douglas M. 807 A.2d 315 (Cmwlth. 2002)

51.     A family has the right to continue to seek, or engage in a private placement, but such placement is at private expense.  A school district is not required "...to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if [the school district] made FAPE available to the child and the parents elected to place the student in private school  34 C.F.R. 300.148(a)

52.     In addition to the above, the residential nature of a placement requires an examination of its necessity in the tuition reimbursement analysis. The federal regulations implementing the IDEIA provide for residential placement if it "is necessary to provide special education and related services to a child with a disability." 34 C.F.R. § 300.104. The question of whether a residential placement must be at public expense requires an examination of whether that full-time placement is "necessary for educational purposes, or whether the residential placement is a response to medical, social or emotional problems that are segregable from the learning process." Kruelle v. New Castle County School District, 642 F.2d 687, 693 (3d Cir. 1981)). In other words, if the medical, social, and emotional components of the residential program are "part and parcel of a specially designed instruction to meet the unique needs of a handicapped child," the local education agency is responsible for that placement. Kruelle at 694.

53.     As a general matter, parents are not entitled to tuition reimbursement if a FAPE was made available to the child but the parent nonetheless chose to enroll the student in a private school.  20 U.S.C. §1412(a)(10(C)(i)

54.     Compensatory education is not an available remedy when a student has been unilaterally enrolled in private school. See 20 U.S.C. § 1412(a)(10); 34 C.F.R. §§ 300.137, 300.138, 300.148(c) ; In re The Educational Assignment of J.D., Spec. Educ. No. 1120, at 14 (Pa. Spec. Educ. Appeals Panel 2001), available at http://odr.pattan.net/ODRapps/App1120.pdf ("[T]uition reimbursement and compensatory education are two distinct remedies. They are not interchangeable. Tuition reimbursement is a remedy to parents who have unilaterally placed their child in a private school when a district offers their child an inappropriate educational placement and the proposed IEP was inappropriate under the IDEA thereby failing to give the child FAPE. In contrast, compensatory education is a retrospective and in kind remedy for failure to provide an appropriate education for a period of time." (citations omitted)).

## VI.     FACTS

56.     J.S. enrolled in the North Allegheny School District in kindergarten.

57.      The District referred J.S. to its ESAP team in kindergarten for concerns with reading and math skill development.

58.     J.S. was recommended for retention in kindergarten but the family declined.

59.     By the end of first grade, J.S. was proficient in reading, however math concerns continued.

60.     On October 20, 2010 J.S. was found eligible for special education services as a student with a specific learning disorder in math reasoning.

61.     In November 2010, an IEP was implemented to address J.S.'s specific learning disability in Math Reasoning.

62.     Parents' consented to Itinerant learning support services on November 15, 2010.

308918;56000.7

63.     On January 27, 2011 a Permission to Re-evaluate was issued.  The Parents consented to the re-evaluation on January 29, 2011.

64.     J.S. was found eligible as a student with a specific learning disability in reading comprehension.

65.     The evaluator recommended that J.S. receive learning support services for math, reading, English, writing and spelling.

67.     The Reevaluation report found J.S. continued to be eligible and recommended supplemental learning support services.

68.     An IEP was developed for J.S. on February 28, 2011.

69.     The level of support was increased for J.S. to supplemental where she received small group instruction in a learning support environment for math, reading, English, writing, and spelling.

70.     On November 5, 2012 during J.S.'s fourth grade year, Parents expressed their opinion that J.S. should be exclusively in regular education classes and revoked consent for J.S. to continue in special education.

71.     At the time, Parent indicated J.S. received above average scores in her subject areas and had obtained proficient scores on the spring 2012 PSSA.

72.     Parents expressed a concern that J.S. rely upon her own learning.  Parents withdrew J.S. from special education services on November 8, 2012 by executing the Prior Written Notice.

73.     The School District issued a PWN on December 18, 2015 as the educational team at Marshall Middle School was concerned with J.S.'s academic performance.

74.     Parents did not provide consent for the evaluation and noted their objection to testing on January 22, 2016.

75.     In March of 2016, the District issued a PWN as a result of expressed concern with J.S.'s academic performance.

76.     On March 13, 2016, Parents did not provide consent for the School District to conduct the initial evaluation.

77.     In J.S.'s eighth grade year, J.S. shared she was experiencing suicidal ideation and had first attempted suicide in sixth grade.

78.     On or about November 17, 2016, J.S.'s classmates reported concerns about her behavior to the school administration. They reported that J.S. had been cutting herself on her arms, and that she had expressed high levels of stress and sadness.

79.     A District counselor completed a Suicide Risk Assessment of J.S.

80.     Based upon the results indicated on the Suicide Risk Assessment, the District recommended that J.S. be picked up from school and taken for a professional mental health assessment.

81.     That same day, per the District's recommendation, the Parents took J.S. to Western Psychiatric Institute Clinic (WPIC) for a Diagnostic Evaluation.

82.     On December 21, 2016, J.S. counselor informed J.S.'s team of educators that she continued to have the same concerns outside of school.  She noted Parents were trying to focus on mental health needs and that the team should consider only essential assignments.

83.     At the conclusion of the second academic marking period, J.S. had a D in three of her core academic classes, and was failing her Algebra class.

84.     J.S. also had a B in Technology Education, a C in Introduction to Spanish, and As in Band and Physical Education.

85.     In January 2017, J.S.'s teachers were asked to complete rating scales for J.S.'s mental health professionals.

86.     On February 8, 2017, J.S's teachers were informed that Parent expected J.S. to return the following day and that the family appreciated their flexibility and consideration given to J.S.

87.     J.S.'s teachers were told to closely monitor her transition back to school to ensure a positive transition.

88.     A meeting was held in February 2017 with Parents to discuss supports as J.S. transitioned back to school.

89.     The School District exempted J.S. from several assignments and provided her additional time to complete essential assignments.

90.     At the time the teachers noted that J.S. was easily distracted by her peers, and struggled with reading comprehension and test/quiz preparation.

91.     In response, J.S.'s school counselor contacted Parents by email on February 16, 2017 and informed them they would receive a Permission to Evaluate to see if J.S. qualified for additional supports.

92.     On February 20, 2017, the District issued a Prior Written Notice for Initial Evaluation and Request Form, which was signed and returned by the Parents on February 22, 2017.

93.      The District proposed the evaluation "due to concerns with J.S.'s behavior, and to help determine appropriate educational needs and services."

94.     On April 30, 2017, the District completed its Evaluation Report. The evaluator found J.S. to demonstrate adequate reading skills, but greater difficulty in reading comprehension in comparison to same-aged peers. She no longer qualified with a specific learning disability in math or reading.

95.     According to Parents and teacher, J.S. was found not to exhibit any serious indications of emotions or behaviors.

96.     J.S. was found to be performing at predicted levels in all academic areas with state and local assessments indicating she was mastering concepts at a rate consistent with her peers. At the time the Evaluation Report was completed in April 2017, J.S.'s most recent grades

were as follows: Ds in English and Social Studies, and Cs in Earth/Space Science and Introduction to Spanish. She was failing Algebra, and had As in Band and Physical Education.

97.     The evaluator noted, "Behavior assessments, observation, and input from staff suggested some concern with J.S.'s behavior, but did not indicate a substantial impact on her performance."

98.     J.S. was found to not have a disability and was ineligible for special education. A Prior Written Notice was issued on April 30, 2017 wherein Parents approved the recommendation on August 24, 2017 for J.S. to remain in her current regular education program.

99.     J.S. began her ninth grade year in August 2017. The first day for students was August 31, 2017.

100.    Within the first twenty-one days of school, J.S. was absent seven days.

101.    Parent informed the District that J.S. was involved in outside counseling.

102.    J.S. was referred to her school counselor over concerns she expressed wanting to hurt herself.

103.    J.S. self-reported attempting self-harm in 8th grade and that she was diagnosed with bipolar depression.

104.    Parent acknowledged awareness that his daughter demonstrated suicidal ideation and agreed to have an assessment completed.

105.    J.S. returned to school on September 20, 2017 and was provided a crisis plan and a pass to access the counselor office at her discretion.

106.    The District issued a Prior Written Notice on September 27, 2017 due to concerns with J.S.'s current mental health status and the impact it was having on her overall well-being, attendance and academic progress. The educational team at NAI requested an updated assessment.

107.    As of October 4, 2017, Parent reported that J.S. was not able to come to school as a result of mental health needs.  J.S. was under the care of a new psychiatrist and also received an evaluation from STAR.

108.    J.S. was admitted to WPIC for psychiatric care on October 4, 2017. Her classroom teachers sent work but it was reported J.S. was overwhelmed and had a hard time completing work while under care.

109.    On October 23, 2017 J.S. was enrolled in Wexford Partial.  The District provided transportation and coordinated her school work.  J.S. did not complete the work.

110.    On October 25, 2017, the District communicated with Parents requesting if they had received the Prior Written Notice issued to them on September 27, 2017.

111.    Parent informed the District that they had in fact received the Prior Written Notice seeking consent to test but considering J.S.'s difficulties preferred to wait until J.S. completed the partial program.

112.    The District reissued a PWN on November 11, 2017.  Parent did not return the Prior Written Notice.

113.    On November 22, 2017 J.S. was transported from Wexford Partial to WPIC.  It was noted that J.S. was having an angry and agitated response to medication.

114.    On November 28, 2017 Parent enrolled J.S. in a private school at Total Learning Center.

115.    The District again reissued a Prior Written Notice on December 1, 2017.

116.    On December 22, 2017 Parents signed a release for Ruder Law to seek educational records from the District.

117.    The School District withdrew J.S. for non-attendance and private enrollment at TLC effective December 15, 2017.

118.    The Parents finally responded to the request to test and provided consent as of February 6, 2018 to conduct an initial evaluation.

119.    The District issued an evaluation report on April 13, 2018.

120.    In summarizing the assessment results on J.S., the evaluator found J.S. to present with an inability to build or maintain relationships, inappropriate behaviors or feelings, pervasive mood/depression and physical symptoms and fears and found her eligible under the classification of Emotional Disturbance.

121.    The evaluator additionally noted J.S.'s diagnosis of anxiety, bi-polar disorder, and oppositional defiant disorder likely accounted for J.S.'s changing moods.

122.    The evaluator recommended the IEP team convene to determine appropriate programming.

123.    On April 30, 2018 the District emailed Parents for an intake IEP.

124.    A meeting was held on May 10, 2018 with K.S. in attendance.

125.    The evaluation report and draft IEP were shared with Parent.

126.    K.S. refused to sign the evaluation report, or any other documents to include noting his attendance at the meeting.

127.    The meeting ended abruptly as K.S. requested to seek the input from J.S.'s private placement at Total Learning Center.

128.    J.S.'s draft IEP placed her in general education for selected academic and elective classes with the exception of resource and social skills classes.

129.    The draft IEP offered J.S. a supplemental level of support in emotional support wherein she would be in the regular education environment 80% of her day.

130.    A draft NOREP dated May 10, 2018 offered J.S. supplemental emotional support services.

131.    On May 29, 2018 and May 31, 2018, the District contacted Parents to schedule a reconvened IEP to review the evaluation report and implement the recommendations for J.S.

132.    On June 1, 2018, Parent responded that he agreed to meet.

133.    On June 4, 2018, Special Education Assistant, Linda Stevens was tasked with calling Parents to set-up the reconvened IEP meeting.

134.    A re-convened meeting was never scheduled.

135.    The District received a request for educational records from Ruder Law on June 4, 2018.

136.    The District mailed the requested records to Ruder Law on July 17, 2018.

## VII.    CAUSE OF ACTION

137.    The Hearing Officer committed reversible error when he concluded the District violated child find.

138.    The Hearing Officer erred in awarding J.S. compensatory education.

139.    The Hearing Officer erred in finding the April 2017 evaluation as inappropriate. The evaluation conducted by the School District was appropriate and fulfilled the purposes evaluations serve, determining eligibility/classification and providing guidance to the IEP team in designing an educational program and placement.

140.    The Hearing Officer failed as a matter of law in awarding tuition reimbursement to J.S.

141.    The Hearing Officer erred as a matter of law in granting J.S. the status of a child with a disability at the time of her withdrawal and thus continuing this protection to each successive private placement despite the failure of parents to provide notice to the District.

142.    Prior to granting consent to evaluate, Parents withdrew JS at their election and had her privately enrolled at the Total Learning Center as of November 28, 2017.

143.    The Hearing Officer erred in concluding the private therapeutic boarding school is appropriate for tuition reimbursement.

144.    The Hearing Officer failed to review the equities to deny or otherwise reduce the tuition reimbursement award. The equities do not favor J.S.

145.     The Parents failed to provide the statutorily required tuition reimbursement notice to the District upon enrollment in TLC on November 28, 2017 and continued to be unreasonable in failing to provide the District notice they sent their child to Bethlehem, Connecticut and later Utah.  The District did not receive any communication or notice of their intent to enroll and seek tuition reimbursement.

146.     The Parents withdrew J.S. during the time the District was attempting to obtain consent to conduct an evaluation.

147.     JS was not identified at the time of the withdrawal and thus has no entitlement to FAPE or to seek IDEA remedies such as compensatory education and tuition reimbursement.

148.     The need for special education and related services had not been established and the Hearing Officer erred in extending J.S. protections accorded a "child with a disability" as defined by the IDEA.

149.     The Hearing Officer erred in awarding tuition reimbursement which was placed at issue over the one year timeframe established by <u>Bernardsville.</u> Parents' claim for tuition reimbursement was filed more than four hundred and twenty-six days after Parents withdrew J.S. from the North Allegheny School District and began attending a private school.

150.     As additional proof of Parents unreasonableness, Parents were unwilling to participate in the development of the IEP in May and June of 2018.  Parents received the draft IEP but left the meeting refusing to even sign paperwork to reflect attendance.

151.     At the time the District was attempting to schedule an IEP meeting, Parents were searching for a residential treatment facility.

152.     Parent acted unreasonably which warrants denial of reimbursement.

153.     Parents had retained counsel knowledgeable in special education law as of December 2017 to receive guidance on their obligation to provide notice of an intent to seek tuition reimbursement.  Parents cannot be excused for the notice requirement.

154.     District met its obligations to JS during the time she was enrolled as a student.

308918;56000.7

155.    The Hearing Officer erred in finding that the residential component of the program was necessary for JS to receive her education.  The residential component basically provided her the same services as a parents would do in their home i.e. chores, direction on hygiene, peer/sibling relations and homework assistance.  The residential component was clearly an option selected by Parent to assist in the repair of the fractured relationship between them and their daughter.  The focus of her therapy was on the parent/child relationship.   The residential component was not required for JS to receive her education.

156.    Even had a Residential Treatment Facility placement been considered as appropriate and necessary, there is a process in Pennsylvania and Allegheny County to be utilized for selecting such an appropriate placement which would likely be located in Western Pennsylvania so as to afford the child and the child's family ample opportunity to maintain communications and personal interaction.  A medical placement in a Residential Treatment Facility several states away from the Commonwealth is overly restrictive.

157.    Parents assumed the risk and at the point of decision-making were represented by counsel knowledgeable in special education law.

158.    The proposed IEP was reasonably calculated to enable JS to progress in light of the information known to the District at the time.

159.    There has been no denial of FAPE because the evidence establishes that JS received meaningful educational benefit from her educational program, and that the District took all necessary steps to address Student's needs under extreme circumstances impacted by her medical needs.  The only obligation of the School District to JS as a resident student was to evaluate for services upon request and if found eligible offer a FAPE program. The District found her eligible and made an offer of FAPE.  Parents refused the District's offer.

WHEREFORE, Plaintiff, the North Allegheny School District requests that this Court:

a.  Assume jurisdiction over this action;

b. Consider the administrative record below and hear additional evidence as necessary to make a decision under the modified de novo review standard of IDEA actions;

c. Reverse the finding of the Hearing Officer that J.S. was "thought to be eligible" and that the District violated its duties under child find;

d. Reverse the finding of the Hearing Officer that J.S. had been denied a FAPE;

e. Reverse the finding of the Hearing Officer awarding compensatory education to J.S.;

f. Find the Parents are untimely and barred for bringing their claim for tuition reimbursement;

g. Reverse the finding of the Hearing Officer awarding tuition reimbursement to J.S.;

h. Order the equities in this matter are against K.S. and B.S. and their actions were unreasonable and properly deny tuition reimbursement.

i. Issue a finding that the residential component of the therapeutic boarding school was not inexplicably tied to J.S.'s educational needs as mandatory component of FAPE.

j. Order the District is not responsible for the tuition, room and boarding costs for the private placement in Utah.

k. Grant such other relief as this Court deems proper.

RESPECTFULLY SUBMITTED:
MAIELLO BRUNGO & MAIELLO
/s/Christina L. Lane
Christina L. Lane
Pa. Id. No. 83677
cll@mbm-law.net
Alfred C. Maiello
Pa. Id. No.
acm@mbm-law.net
Steven P. Engel
Pa. Id. No.
spe@mbm-law.net

424 South 27th Street, Suite 210
Pittsburgh, PA 15203
(412) 242-4400

Attorneys for Plaintiff
North Allegheny School District

Dated: February 14, 2020

308918;56000.7

# Pennsylvania Special Education Due Process Hearing Officer
# Final Decision and Order

### Closed Hearing

### ODR File Number
21657-1819AS

### Child's Name
████████

### Date of Birth
████

### Parent(s)/Guardian(s)



### Counsel for Parent(s)/Guardian(s)
Kristen Weidus, Esq.
Alicia M. Simpson, Esq.
429 Forbes Avenue, Suite 450
Pittsburgh, PA 15219

### Local Educational Agency
North Allegheny School District
200 Hillvue Lane
Pittsburgh, PA 15237

### Counsel for LEA
Christina Lane, Esq.
424 South 27th Street, #210
Pittsburgh, PA 15203

### Hearing Officer
Brian Jason Ford, JD, CHO

### Date of Decision
11/18/2019

1

## Introduction

This special education due process hearing concerns the educational rights of a student (the Student).[1] The hearing was requested by the Student's parents (the Parents) against the Student's school district (the District).

The Parents allege that the District violated the Student's rights under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq*. and Section 504 of the Rehabilitation Act of 1973 (Section 504), 29 U.S.C. § 701 *et seq*. Specifically, the Parents allege that the District failed to timely identify the Student as a child with disabilities (this is referred to as a Child Find violation), failed to offer the Student a free, appropriate public education (FAPE), and acted with deliberate indifference while violating the Student's rights.

The period of time in question runs from January 28, 2017 though the present. During that time, the Student was enrolled in the District from January 28, 2017 through November 28, 2017. The Student attended a private placement (School 1) at the Parents' expense from November 28, 2017, through June 4, 2018. The Student then attended a private, therapeutic, residential treatment program from July 24, 2018 through August 3, 2018 (the Parents do not demand tuition reimbursement for this placement). On August 3, 2018, the Student transferred to another private placement (School 2) and has remained in that placement through the present. The District was the Student's local educational agency (LEA) at all times.

The Parents demand compensatory education to remedy the denial of FAPE from January 28, 2017 through November 28, 2017. The Parents also

---

[1] Except for the cover page, I have omitted information that could identify the Student to the extent possible.

2

demand tuition reimbursement for the Student's attendance at School 1 and School 2. The Parents also requested prospective placement at School 2 but withdrew that demand.

The Parents initiated this hearing by filing a complaint on January 28, 2019. The Parents filed an amended complaint on April 18, 2019. The hearing convened on July 15, 2019. As the hearing was set to begin, the parties conceded that few to no facts were in dispute and agreed to proceed on a stipulated record.

The parties filed joint stipulations on September 17, 2019. The hearing convened again on September 23, 2019, to supplement the joint stipulations with testimony.

For reasons set forth below, I find that the District violated the Student's right to a free appropriate public education (FAPE) and is owed compensatory education for a portion of the time prior to placement in School 1. I further find that the Parents are not entitled to tuition reimbursement for the Student's placement at School 1. I further find that the Parents are entitled to tuition reimbursement for the Student's placement at School 2. I do not find that the District acted with deliberate indifference.

## Issue(s) Presented

The issue(s) presented for adjudication in this matter are:

1. Did the District deny the Student a FAPE from January 28, 2017 through the Student's enrollment in a private placement November 28, 2017, and, if so, does the District owe compensatory education to the Student?

3

2. Does the District own the Parents tuition reimbursement for the Student's attendance at School 1 from January 28, 2017, through June 4, 2018?

3. Does the District own the Parents tuition reimbursement for the Student's attendance at School 2 from August 3, 2018 through the end of the 2019-20 (current) school year?

## Findings of Fact

### Stipulated Facts

I adopt nearly all of the parties' joint stipulations as my own findings of fact. I have copied the joint stipulations, changing the parties' language only to remove identifying information and to make minor grammatical edits. The least significant changes, like changing the Student's initials to "the Student," are not indicated with brackets. Reference to "Parent" is changed to "Parents" except as needed for clarity (the Parents are a single party and acted together at all times). Some stipulations were re-ordered to place events in chronological order. I have also kept the parties' sub-headings with minor edits. I have not, however, adopted stipulations that are not relevant to the issues in this case. For example, I have not included stipulations about the cost of any program.

### Enrollment

1. The Student enrolled in the District in kindergarten. (S-7).

2. The District referred the Student to its ESAP team in kindergarten for concerns with reading and math skill development. (S-7).

3. The District recommended the Student retention in kindergarten but the family declined. (S-7).

4

4.    By the end of first grade, the Student was proficient in reading,
      however math concerns continued. (S-7).

### *The Initial Evaluation*

5.    [In 2nd grade, on] October 20, 2010, the Student was found eligible for
      special education services. (S-7).

6.    Parents noted concerns with learning math concepts. (S-7).

7.    The Student expressed concerns to the evaluator with the Student's
      difficulty in math. (S-7).

8.    The Student's overall intellectual ability was found to be in the low
      average range in Full Scale IQ, but the Student's General Ability Index
      found [to be] in the average range.  The evaluator found the GAI to be
      the most meaningful representation of [the Student's] global cognitive
      functioning. (S-7).

9.    The Student was found to have a particular strength in verbal
      comprehension. (S-7).

10.   The Student displayed low average perceptual reasoning and working
      memory skills. The Student had significant weakness in visual
      processing speed. (S-7).

11.   The Student displayed limited number sense and slow processing time
      for math. The Student also was found to have difficulty with
      measurement, numerical order, patterning, and money. (S-7).

12.   The Student was found eligible for special education as a student with
      a specific learning disorder in math reasoning. (S-7).

13.   The evaluator recommended learning support services for math. (S-7).

### *The First IEP*

14. In November 2010, an IEP was implemented to address the Student's specific learning disability in Math Reasoning. (S-8).

15. Parents shared their concern about the Student improving overall academic skills [during] the development of the IEP. (S-8).

16. The IEP team developed three math goals for the Student. One for basic subtraction and addition; the second for math word problems in developing a plan to analyze; and the third to demonstrate one-to-one correspondence, rote counting, counting by twos, five and tens, and comparing values of whole numbers up to 500. (S-8).

17. The Student received systematic, explicit instruction in the area of basic [math] facts. (S-8).

18. The Student received assistance with a number line, and key words to solve math problems. (S-8).

19. The Parents consented to [an itinerant level of] learning support services on November 15, 2010. (S-8).

### *Reevaluation*

20. [Still in 2nd grade, on] January 27, 2011 [the District issued] a Permission to Re-Evaluate [form]. The Parents consented to the re-evaluation on January 29, 2011. (S-9).

21. The Student's teacher reported concerns with skill deficits in phonics, word analysis and comprehension skills. As the work became more difficult, the Student began to fall behind peers. (S-9).

6

22. On the Wechsler Individual Achievement Test Third Edition (WIAT-III), the Student scored in the sixth percentile rank in Early Reading Skills and in the forty-second percentile rank in Reading Comprehension. (S-9).

23. The Student was found eligible as a student with a specific learning disability in reading comprehension. (S-9).

24. The evaluator recommended that the Student receive learning support services for math, reading, English, writing and spelling. (S-9).

25. The Reevaluation report [dated February 28, 2011] found the Student continued to be eligible and recommended [a] supplemental [level of] learning support services. (S-9).

### *Change in Placement, Level of Service*

26. [Still in 2nd grade, another] IEP was developed for the Student on February 28, 2011. (S-10).

27. The [District increased the Student's] level of support … to supplemental[.] … [The Student] received small group instruction in a learning support environment for math, reading, English, writing, and spelling. (S-10).

28. The Parents shared with the IEP team that the Student enjoyed reading and math and that the Student had a challenge following directions. (S-10).

29. The Student's IEP team continued to provide math goals on basic facts, math computation and one-to-one correspondence, rote counting, counting by twos, five and tens, and comparing values of whole numbers up to 500. (S-10).

30. The IEP noted that the Student had made progress on single digit addition/subtraction at 100% accuracy. (S-10).

31. The IEP noted progress in double-digit addition with 100% accuracy and double-digit subtraction with 80% accuracy. (S-10).

32. The Student's identification of information required to solve a math problem was reported at 69% accuracy and later 20% [accuracy] with the notation that the Student was rushing through work. (S-10).

33. The Student was able to count by twos and tens with 100% accuracy and compared values of whole numbers with 100% accuracy. (S-10).

34. [The IEP Team added a] reading comprehension goal … to the Student's IEP. The Student demonstrated 72% accuracy in reading comprehension. (S-10).

### *Withdraw from Special Education*

35. On November 5, 2012, during the Student's fourth grade year, the Parents expressed their opinion that the Student should be exclusively in regular education classes and revoked consent for the Student to continue in special education. (S-11).

36. At the time, the Parents indicated that the Student received above average scores in her subject areas and had obtained proficient scores on the spring 2012 PSSA. (S-11).

37. The Parents expressed a concern that the Student rely upon her own learning.[2] (S-11).

---

[2] While I accept this stipulation as an accurate statement of what the Parents expressed at the time, the meaning of this statement is not fully explained by the record of this case.

38. The Parents withdrew the Student from special education services on November 8, 2012, by executing a Prior Written Notice document. (S-12).

### *First Post-Withdraw Prior Written Notice for Initial Evaluation*

39. [During the Student's 7th grade year, the] District issued a PWN on December 18, 2015, as the educational team at the Student's middle school was concerned with the Student's academic performance.[3] (S-13).

40. Parents did not provide consent for the evaluation and noted their objection to testing on January 22, 2016. (S-13, p. 4).

### *Second Post-Withdraw Prior Written Notice for Initial Evaluation*

41. In March of 2016, [still during the Student's 7th grade year,] the District issued another PWN as a result of expressed concern with the Student's academic performance. (S-14, p. 1).

42. On March 13, 2016, Parents [denied] consent for the School District to conduct the initial evaluation. (S-14, p. 4).

### *The 2016-17 School Year – 8th Grade*

43. In the Student's eighth grade year, the Student was experiencing suicidal ideation. (P-3).

44. The Student reported to the school counselor that the Student had first attempted suicide in sixth grade. (P-3, p. 2).

---

[3] This type PWN is more commonly referred to as a Permission to Evaluate - Consent Form or a PTRE. I will use the parties' terminology when describing the form.

45.  On November 17, 2016, the Student's classmates reported concerns about the Student's behavior to the school administration. (P-3).

46.  Peers reported that the Student had been cutting the Student's own arms and that the Student had expressed high levels of stress and sadness. (P-3; S-16. p. 3).[4]

47.  The school counselor (the Counselor) completed a Suicide Risk Assessment form, and the Student shared that the Student had been in counseling beginning the previous year. (P-3, p. 2).

48.  Upon completing the Suicide Risk Assessment, the District recommended that the Parents pick up the Student from school and take the Student for a professional assessment. (S-16, p. 3).

49.  That same day, per the District's recommendation, the Parents took the Student to [a psychiatric clinic] for a Diagnostic Evaluation. (P-4, p. 1; P-6, p. 1).

50.  On November 17, 2016, the Counselor informed teachers of emotional health concerns with the Student. The Counselor noted that the Student was cutting on the Student's arms, and the Student expressed high levels of stress and sadness. The Counselor further requested the Student's teachers to keep an eye out for when the Student returned to school. (S-15, p.1).

51.  The Counselor also explained that the family was seeking "outside supports" at that time. (S-15, p. 1).

---

[4] ODR Hearing Officers draft around gendered pronouns to protect the Student's privacy even if doing so yields awkward phrasing.

52. That same day, the Counselor reported that the Student "continued to struggle with … emotional state and missed several days of school." (P-14, p. 3).

53. On December 21, 2016, the Counselor informed the Student's team of educators that the Student continued to have the same concerns outside of school. The Counselor noted that the Parents were trying to focus on mental health needs and that the team should consider only essential assignments. (S-15, p.1).

54. The Counselor also explained to the teachers in the December 21, 2016 email that the Parents were taking the Student to an appointment that day to "determine the level of care needed." (S-1, p. 1).

55. At the conclusion of the second academic marking period of the 2016-17 school year, the Student had a D in three core academic classes, and was failing Algebra. (P-8, p. 3).

56. The Student also had a B in Technology Education, a C in Introduction to Spanish, and As in Band and Physical Education. (P-8, p. 3).

57. Between January 3, 2017 and January 4, 2017, the Student's teachers were asked by the Student's mental health providers to complete rating scales related to the Student's behavior. (P-11, pp. 2-5).

58. The Student's English teacher wrote that the Student "seems dazed or unaware frequently. [The Student] is reluctant to accept recommendations or help or constructive criticism." (P-11, p. 2).

59. The Student's math teacher indicated that the Student showed a serious problem during the period he observed, noting that the Student was moody, tearful, and withdrawn. (P-11, p. 5).

60. On January 17, 2017, the Counselor emailed the Parents forms for "[the Student's] next appointment." These forms included the teacher rating scales completed earlier that month. (P-11, p. 1).

61. In that same January 17, 2017 email, the Counselor also asked that the Parents "let us know if we can be of further assistance for any of [the Student's] outside supports." (P-11, p. 1).

62. Between February 2 and 8, 2017, the Student was hospitalized for depression and suicide attempt. (S-16).[5]

63. The Counselor contacted the team on February 3, 2017 and indicated that she had talked to the Student's teacher at the therapeutic program and was informed that the Student would likely miss another week of school. District teachers were requested to bring essential assignments for two weeks. (S-15).

64. On February 8, 2017, the Counselor informed the Student's team that Parents expected the Student to return the following day and that she appreciated their flexibility and consideration given to the Student. The Counselor requested the team to monitor the Student closely to ensure a positive transition. (S-15).

65. On February 8, 2017, the District sent correspondence to Parents to facilitate communication between home and school regarding the Student's absences. The District informed Parents that the Student had missed 10 or more days of school. The District explained it was standard procedure to send the letter and that the District recognized that the Student had experienced extenuating circumstances.

---

[55] This finding is not a stipulation but is added here for context. This fact is not in dispute.

66. On February 15, 2017, a meeting was held with Parents to transition the Student back to school. The Parents and District discussed supports for the Student. A PTE was issued. (S-15, p. 2; P-14, p. 3; S-16).

67. The District exempted the Student from several assignments and provided additional time to complete essential assignments. (S-15).

68. At the time the teachers noted that the Student was easily distracted by peers and struggled with reading comprehension and test/quiz preparation. (S-15).

69. The Counselor contacted Parents by email on February 16, 2017 and informed them they would receive a Permission to Evaluate to see if the Student qualified for additional supports. (S-15).

### *2017 Evaluation Report*

70. On February 20, 2017, the District issued a Prior Written Notice for Initial Evaluation and Request Form, which the Parents signed and returned on February 22, 2017. (P-12).

71. The District proposed the evaluation "due to concerns with the Student's behavior, and to help determine appropriate educational needs and services." (P-12, p. 2).

72. On April 25, 2017, the District sent a second letter informing Parents that the Student missed 18 days of school and that the District would require a doctor's excuse for all future absences. The April 25, 2017 notice contained the same explanation regarding standard procedures and the District's acknowledgment of the Student's extenuating circumstances. (P-9, p. 2).

73. The Student was evaluated during 8th grade at the District's middle school. (S-16).

74. The request to evaluate was issued to address serious behaviors including self-harm. (S-16; P-14, p.2).

75. On April 30, 2017, the District completed its Evaluation Report. (P-14; S-16).

76. The Parents reported that the Student exhibited impulsiveness and defiance at home but not of a serious nature. (S-16).

77. Several of the Student's teachers were asked to provide feedback for the report. (P-14, p. 2).

78. Teachers reported that the Student's preferred to complete work without assistance; had difficulty sustaining effort; absences; was distracted and preoccupied with friends; had difficulty in writing; had difficulty with tests; lethargy; weakness in reading comprehension; distracted and unmotivated. (S-16).

79. Teachers reported using the following strategies: private conversations to review expectations, errors and reteach challenging concepts; regularly calling on the Student to ensure attention and understanding; opportunities to seek assistance in homeroom and activity periods; and extensions for assignments and projects. (S-16).

80. The Counselor reported the following:

   a. The Counselor noted the history of peer concerns and suicide risk assessment from November 2016; the history of absences from December 2016; and the hospitalization and transition meeting in February 2017.

14

b. The Counselor also reported that the Student was continuing to have difficulty with academics and utilized a counseling office pass when having difficulty with emotions or academics. (S-16).

81. The Student's English teacher indicated that the Student regularly needed assistance with directions. She also explained that over the previous thirty days, the Student had appeared increasingly lethargic. (P-14, p. 2).

82. The Student's homeroom and Social Studies teacher also reported that the Student appeared very quiet in his class. (P-14, p. 2).

83. The Student's physical education teacher responded that the Student seemed increasingly distracted and unmotivated. (P-14, p. 2).

84. The evaluator found the Student to demonstrate adequate reading skills, but greater difficulty in reading comprehension in comparison to same-aged peers. The Student no longer qualified with a specific learning disability in math or reading. (S-16).

85. The Student's social-emotional functioning was assessed using the Behavior Assessment for Children (BASC-3), Children's Depression Inventory, and the Emotional Disturbance Decision Tree. (S-16).

86. The Student was asked to complete the BASC-3 Self-Report. (P-14, pp. 12-13).

87. The Student's responses resulted in clinically significant scores on the Attitude to School and Self-Esteem subtests. (P-14, pp. 12-13).

88. The evaluator interpreted the Student's results with caution indicating the Student views the Student's own behavior in an overly positive manner. (S-16).

15

89.   The evaluator also reported, "[The Student] responded to critical items indicating that she hates school and does not feel safe at school. [The Student] feels as though [the Student] rarely gets things right and is not understood." (P-14, p. 13).

90.   The Student also reported to the evaluator that she felt as though teachers did not care about [the Student], or recognize [the Student's] accomplishments. (P-14, p. 13).

91.   Two classroom teachers, [the Student] and [the Student's] mother completed the BASC-3. (S-16).

92.   The evaluator noted Parent's responses as valid and interpretable. Parent rated the Student's behavior as mostly normative and did not endorse any problematic behaviors or feelings. Parent reported that the Student has a strong sense of self and high expectations both academically and socially. (S-16).

93.   The first teacher to complete BASC, was the Student's science teacher. Her responses resulted in a clinically significant score for the Student on the leadership subtest. (P-14, p. 13).

94.   The science teacher's scores resulted in at-risk scores on the learning problems and study skills subtests. (P-14, p. 13).

95.   The science teacher was unable to provide a score for the internalizing problems, anxiety, or functional communication subtests. (P-14, p. 13).

96.   The evaluator explained this lack of data, stating: "Due to the lack of observed behavior in certain areas, [the science teacher] did not have enough insight to produce a response, which limited interpretation of several subscales." (P-14, p. 14).

16

97.   The Student's English teacher also completed the BASC rating scale. (P-14, p. 13).

98.   The English teacher's scores placed the Student in the clinically significant range on the following subtests and indexes: internalizing problems, depression, school problems, attention problems, learning problems, the behavioral symptoms index, atypicality, withdrawal, adaptive skills, adaptability, social skills, leadership, study skills, and functional communication. The English teacher's scores placed the Student in the at-risk range on the externalizing problems, aggression, conduct problems, anxiety, and somatization subtests. (P-14, p. 13).

99.   The evaluator found the classroom teachers to indicate substantial differences between content areas in science and English. The English teacher's responses were interpreted with caution as viewing the Student in an overly negative manner. (S-16; P-14, p. 14).

100.  The CDI-2 was completed by the Student, the Parents and the Student's Spanish teacher. (S-16; P-14, p. 14).

101.  The CDI-2 requests the respondents to base observations of the student within the past two weeks. (S-16).

102.  The emotional problems and functional problems subtests were included. (P-14, p. 14).

103.  The evaluator noted the respondents did not indicate the presence of any serious concerns. (S-16).

104.  The Student reported that some of her feelings result in functional difficulty, but not of a substantial or serious impact. (S-16).

17

105. The EDDT was completed by Parents and the Student's teacher. (S-16).

106. According to Parents and teacher, the Student was found not to exhibit any serious indications of emotions or behaviors. (S-16).

107. The Student was found to be performing at predicted levels in all academic areas with state and local assessments indicating she was mastering concepts at a rate consistent with her peers. (S-16).

108. At the time the Evaluation Report was completed in April 2017, the Student's most recent grades were as follows: Ds in English and Social Studies, and Cs in Earth/Space Science and Introduction to Spanish. The Student was failing Algebra, and had As in Band and Physical Education. (P-8, p. 3).

109. The evaluator noted, "Behavior assessments, observation, and input from staff suggested some concern with the Student's behavior, but did not indicate a substantial impact on her performance." (P-14, p. 18).

110. The Student was found to not have a disability and was ineligible for special education. (S-16).

111. A NOREP was issued on April 30, 2017 wherein Parents approved the recommendation on August 24, 2017 for the Student to remain in the current regular education program. (S-17).

### The 2017-18 School Year – 9th Grade

112. The Student began 9th grade on August 31, 2017.

113. The Student was referred to her school counselor over concerns she expressed wanting to hurt herself. (SD-18)

114.  The Student self-reported attempting self-harm in 8th grade and a diagnosis of bipolar depression. (SD-18).

115.  The Parents acknowledged that the Student demonstrated suicidal ideation and agreed to have an assessment completed. (SD-18).

116.  Parent informed the District that the Student was involved in outside counseling. (SD-18).

117.  Within the first twenty-one days of school, the Student was absent seven days. (P-22, p. 1).

118.  The Student returned to school on September 20, 2017, and was provided a crisis plan, no contact order for issues with peers and a pink pass to access the counselor office.  (SD-22).

119.  The Parents submitted medical excuses for several of the Student's absences, including September 27, October 2, and October 4, 2017. (P-10).

120.  The District issued a PWN on September 27, 2017 due to concerns with the Student's current mental health status and the impact it was having on the Student's overall well-being, attendance, and academic progress. The educational team at NAI requested an updated assessment. (S-23; P-17, pp. 9-11).

121.  As of October 4, 2017, Parent reported that the Student was not able to come to school as a result of mental health needs. The Student was under the care of a new psychiatrist and also received an evaluation from STAR.[6] (S-22).

---

[6] STAR is "Services for Teens at Risk," a program run by the University of Pittsburgh Medical Center (UPMC)

19

122. The Student was admitted to WPIC[7] for psychiatric care on October 4, 2017. The Student's classroom teachers sent work but it was reported that the Student was overwhelmed and had a hard time completing work while under care. (SD-22).

123. On October 23, 2017, the Student was enrolled in Wexford Partial. The District provided transportation and coordinated schoolwork. The Student did not complete the work. (S-19; S-22; P-6, pp. 10-13, 18).

124. On October 25, 2017, a different school counselor communicated with the Parents, asking if they had received the PWN. (SD-20).

125. The Parents informed the counselor that they had in fact received the PWN but considering the Student's difficulties preferred to wait until the Student completed the partial program. (SD-20).

126. The District reissued a PWN on November 11, 2017. The Parents did not return the PWN. (SD-24).

127. On November 22, 2017, the Student was transported from Wexford Partial to WPIC. The Student was having an angry and agitated response to medication. (S-22).

128. The Parents informed new counselor they were looking to enroll the Student in School 1 or a different private school. (S-22).

129. On November 29, 2017 the Student's father called the District and reported that the Student "may be going to" School 1.[8] (S-22).

130. The District reissued a PWN on December 1, 2017. (S-25).

---

[7] WPIC is the Western Psychiatric Institute and Clinic, also affiliated with UPMC.
[8] The parties joint stipulation about this message contained an incorrect date that is corrected in this decision.

131. On December 12, 2017, the new counselor confirmed with Parents that the Student was now enrolled in School 1 and had been attending for several weeks. (S-21).

132. The School District withdrew the Student for non-attendance and private enrollment at School 1, effective December 15, 2017. (S-21, S-22).

133. On December 22, 2017, the Parents signed a release for the law firm that represents the Parents in this due process hearing to seek educational records from the District. (S-34).

### 2018 Evaluation

134. On February 6, 2018, the Parents provided consent for the District to conduct an initial evaluation. (S-23; P-32).

135. On March 29, 2018, the Parents authorized School 1 to send scholastic grades; standardized achievement test scores; standardized ability/aptitude test scores; psychological evaluation; special education records; attendance information; discipline reports; and health records to the District. (P-35, pp. 1-2).

136. As part of the District's Evaluation, on April 12, 2018, the Student completed a Children's Depression Inventory 2 Self-Report form. The Student reported being sad all the time, self-hating, wanting to kill self, feeling like crying every day, and never having fun at school. (P-36, pp. 1-2).

137. The Student also completed a Revised Children's Manifest Anxiety Scale-2. The Student reported being nervous, worrying, getting mad easily, and getting teased at school. (P-36, pp. 9-10).

21

138. As part of the District's Evaluation, Parents completed an Emotional Disturbance Decision Tree Parent Form. Parents reported that the Student frequently makes statements that put herself down, behaves in an unusual or strange manner compared to peers, breaks or throws things to express frustration, and displays angry outbursts. (P-36, pp. 3-6).

139. As part of the Evaluation, the Parents completed a Parent Input Form noting that the Student struggles with academics, feels bullied, refused to attend the District, and avoided work. The Parents also noted that the Student had a mental health diagnosis and was under psychiatric care. (P-36, p. 7).

140. The Parents completed a Parent Interview on April 12, 2018 as part of the District's Evaluation. The Parents noted that the Student had attendance problems for two years and that a diagnosis of Bipolar Disorder could be a cause. The Parents noted that the Student has anxiety, self-harming behaviors, and anger. The Parents noted academic concerns about "everything." (P-36, pp. 11-14).

141. The Parents also completed a Student and Parent Survey for Transition Planning for the District's Evaluation on April 12, 2018. On this form, The Parents provided the names of the Student's treating medical providers. (P-36, pp. 15-18).

142. The Parents completed a Checklist for the Woodcock Johnson IV assessment. Parents reported that the Student had a hard time concentrating, often did not seem to listen when spoken to directly, often had difficulty organizing tasks and activities, and disliked school so much that the Student did not want to go and did not try to succeed in school. (P-36, pp. 19-25).

22

143. In the home setting, the Parents reported that the Student failed to pay close attention to details and made careless mistakes. The Parents offered that the Student had difficulty sustaining attention and was easily distracted. (S-26).

144. The Parents described the Student as often interrupting others or intruding on others. (S-26).

145. Parent offered that the Student's strength is that the Student is very musically talented and looked to music for a profession. (S-26)

146. Parental concerns were noted as the Student feeling bullied and, as a result, the Student avoided work. (S-26).

147. Parents shared that the Student was under psychiatric care. (S-26).

148. On an attendance interview form, Parent reported that the Student's attendance problems were influenced by a psychiatric diagnosis of Bipolar Disorder. (S-26).

149. The Parents shared that the Student had a few friends and got along with her siblings but tended to be fearful of same-age peers. (S-26).

150. Behavior problems noted by the Parents were anxiety, self-harm and anger. (S-26).

151. Several staff members from School 1 provided information on the Student's skills, work, behaviors, strengths, and weaknesses. (P-37, p. 3).

152. In sum, School 1 teachers and personnel reported that the Student's oral language ability as average; average oral expression; average reading fluency and mathematics calculation; limited ability for listening comprehension; and very limited ability for math problem

solving – although the Student would sometimes refuse to do work. (S-26; P-37).

153.   School 1 teachers and personnel also remarked that the Student was be distractible, had difficulty sustaining attention to tasks, was emotional, always unhappy, defiant, impulsive, fidgety, and an excessive talker and interrupter who talks loudly and swears – but also avoided peer interaction. The Student seemed unhappy most of the time and showed intense "highs" of energy followed by periods of sadness or depression. Descriptors included defiant, emotional, and troubled. (S-26; P-37).[9]

154.   School 1 teachers and personnel found that the Student requires a high level of one-to-one assistance, and that need was one of the Student's most significant issues. (S-26; P-37).

155.   School 1 teachers and personnel shared that the Student is artistic and intelligent, and that emotional and behavioral issues diminished these strengths. (S-26; P-37).

156.   School 1 teachers utilized the following classroom strategies with the Student: extra time on homework and quizzes, modified assignments, grading only completed work, encouragement to participate, positive reinforcement, use of a daily goal (S-26; P-37).

157.   Classroom observations were completed by School 1 staff. (S-26; P-37, p. 8).

158.   Observations revealed that the Student typically began tasks only after teacher assistance and the Student stayed on task for a limited

---

[9] This finding and several of those that follow are a summary of multiple stipulations that describe comments written in an evaluation report in great detail.

24

amount of time. In a special education classroom, the Student began the observed task promptly, but did not continue when the teacher gave notes and asked the Student make corrections. (P-37, p. 8).

159. Recommendations by School 1 teachers included: one-on-one instruction set at the Student's pace, classroom reinforcers, constant monitoring, positive behavior support plan, and breaks if needed. (P-37, p. 8).

160. The District's evaluator used the following assessment tools: record review, Children's Depression Inventory, Revised Children's Manifest Anxiety Scale, Behavior Assessment System for Children and the Emotional Disturbance Decision Tree-Parent form. (S-26).

161. The Children's Depression Inventory - Second Edition revealed very elevated scores in the following areas: Emotional Problems, Negative Mood/Physical Symptoms, and Negative Self-Esteem. (P-37, p. 9).

162. The Revised Children's Manifest Anxiety Scale - Second Edition revealed extremely problematic scores in worry, social anxiety, and overall Total Anxiety. (P-37, p. 11).

163. As part of the Evaluation, the Student's teachers were asked to complete behavior rating scales. (P-37, pp. 11-15).

164. The teachers reported her as clinically significant in Hyperactivity, Aggression, Anxiety, Depression, Somatization, Atypicality, Withdrawal, Attention Problems, Adaptability, and Social Skills. (P-37, pp. 11-15).

165. The District issued an evaluation report on April 13, 2018. (S-26; P-37).

166. In summarizing the assessment results, the evaluator found the Student to present with an inability to build or maintain relationships, inappropriate behaviors or feelings, pervasive mood/depression and physical symptoms and fears. The Evaluator found the Student eligible under the classification of Emotional Disturbance. (S-26, P-37, pp. 16, 19).

167. The evaluator additionally noted the Student's diagnosis of anxiety, bi-polar disorder, and oppositional defiant disorder likely accounted for the Student's changing moods. (S-26).

168. The evaluator recommended the IEP team convene to determine appropriate programming. (S-26).

169. Recommendations for the IEP team were the following:

   a. Provide the Student with opportunities for self-monitoring her task performance and social behavior.

   b. Encourage the Student to chart performance and/or behavior.

   c. Verbal mediation as a tool to direct the Student's focus to behavior or work. Model, cue and encourage use of phrases "what works?" and "what doesn't work?" as self-monitoring tools.

   d. Discuss or review behavior removed from situation and peers.

   e. Encourage the Student to identify strengths and weaknesses. Provide guided feedback to increase self-awareness. (S-26).

### *2018 IEP Team Meeting*

170. On April 30, 2018, the District's Lead Support Teacher emailed Parents for an intake IEP. (S-27).

26

171. The Lead Support Teacher noted several unsuccessful attempts he made to contact the Parents by phone. (S-27).

172. Lead Support Teacher proposed May 10, 2018 as the meeting date. The Parents agreed to attend. (S-27).

173. A meeting was held on May 10, 2018 with the Parents in attendance. (S-32; P-38).

174. The Lead Support Teacher stated the purpose of the meeting was to review the evaluation report and assess whether or not Parents were in agreement with the recommendations. (S-32).

175. The evaluation report and draft IEP were shared with Parents. (S-32).

176. The Lead Support Teacher noted Parents request to have the documents reviewed by School 1. (S-32).

177. The Lead Support Teacher noted Parents refusal to sign the evaluation report, or any other documents including the invitations to the meeting. (S-32).

178. The meeting did not continue as the Parents requested to seek the input of School 1 staff. (S-32).

179. The Lead Support Teacher requested the Parents to update the school district on whether or not they approved or disproved the evaluator's recommendations and finding of eligibility for special education. (S-32).

180. The Lead Support Teacher said that he was ready to review the documents and that it was essential to work as a team to determine the appropriate placement for the Student. (S-32).

### *2018 IEP*

181. The draft IEP dated May 10, 2018 included the results of the most recent evaluation report. (S-30; P-39).

182. The District checked the "no" box for "Does the student exhibit behaviors that impede his/her learning or that of others?" in the IEP. (P-39, p. 5).

183. The May 10, 2018 IEP provided for one goal that stated: "During her resource period, the Student will be able to 1. Access electronic grade-book to determine outstanding assignments, 2. Identify upcoming assignments, projects or assessments, 3. Develop a plan of study for resource class, 4. Share the plan with resource teacher, and 5. Complete the plan of study during resource period 4 out of the 5 days [the Student] is present with 75% accuracy." (P-39, p. 21).

184. The draft IEP contained the following program modifications and specially designed instruction for J.S. (S-30; P-39).

   a. Opportunities to self-monitor task performance and social behavior with teacher providing cues, subtly as possible.

   b. Utilized self-prediction of how well the Student will complete a task to increase her awareness of her strengths and weaknesses.

   c. Encourage the Student to chart performance and behavior.

   d. Model, cue and encourage use of phrases with the Student "What works?" and "What doesn't work?" as a self-monitoring tool.

   e. When necessary discuss or review behavior removed from situation and peers.

28

f. Encourage the Student to identify strengths. Provide guided constructive feedback to increase self-awareness.

g. Use of "pink pass" for access to counselor when anxious.

h. Extended time for testing.

i. Extended time on homework and identified assignments.

185. The supports for school personnel listed consultation between regular education and special education to discuss strategies and what works and does not work and to revise as necessary. (S-30; P-39).

186. The draft IEP placed the Student in general education for selected academic and elective classes with the exception of resource and social skills classes. (S-30; P-39, pp. 26, 28).

187. The draft IEP offered the Student a supplemental level of support in emotional support wherein the Student would be in the regular education environment 80% of the day. S-30 (P-39, pp. 27, 28).

188. A draft Notice of Recommended Educational Placement (NOREP) dated May 10, 2018 offered the Student supplemental emotional support services. (S-31; P-40).

### *District Correspondence to Reconvene the IEP Team*

189. On May 29, 2018, the Lead Support Teacher emailed Parents to schedule a reconvened IEP. The Lead Support Teacher noted his inability to contact Parents via phone. (S-32).

190. On May 31, 2018, the Lead Support Teacher requested Parents to reconvene as an IEP team to review the evaluation report and implement the recommendations.  (S-28, S-33).

191. On June 1, 2018, the Parents responded that they agreed to meet. (S-28, S-33).

192. On June 4, 2018, the District's Special Education Assistant was tasked with calling Parents to set-up the reconvened IEP meeting. (S-29).

193. The District received the December 2017 records request from the Parents' law firm on June 4, 2018. (S-34). The District mailed the requested records to Ruder Law on July 17, 2018. (S-34, S-35).

194. A re-convened meeting was never scheduled. (S-29).

### *Stipulations about School 1 and Therapeutic Placement*

The Parties stipulate that information contained in stipulation 195 through the final stipulation was not shared with the District during the time that the Student was enrolled in the District, tested for IDEA eligibility, or in the development of IEP programs unless referred to specifically in prior stipulations of fact. These stipulations were not reordered into the chronology above to preserve the parties' agreement about what the Parents shared with the District at various points in time. Findings 198 is my own finding, combining multiple stipulations.

### *Stipulations about School 1*

195. The Student began attending school at the School 1 on November 28, 2017. The Student observed the program for the first time on November 21, 2017. (P-25, p. 1).

196. The Student's classes at School 1 upon enrollment included: reading/writing, math, life science, world culture/geography, and an Executive Functioning Class. (P-25, p. 1).

197. The Student received school counseling services at School 1. (P-25, p. 1).

198. School 1 personnel was frequently unable to control the Student's behaviors, despite working with a family-based counselor. The Student would frequently attempt to elope (either out of the building or to unsupervised areas of the building), refuse to leave classes or offices, express negative thoughts and feelings both about self and about School 1, engage in defiant behavior, run, yell and scream, cry, express paranoid feelings, report bazar behavior at home, and request lengthy meetings with teachers, counselors, and the principal that were ultimately unproductive. The Student was also frequently absent, not participating if in school, and had difficulty getting out of the car to go into school. On one occasion, the Parents, Student, and School 1 personnel decided that the Student should remain in school despite expressing suicidal thoughts. These incidents are set forth in full at P-25.

199. The Student's presentation at School 1 never improved and deteriorated starting in February 2018. By April 4, 2018, it was decided that the Student would do classwork at home. The Student's classwork was sent to electronically. The Student was to complete work during the day and send it in to be corrected and graded. School 1 reviewed the Student's work each day but it was not completed. School 1 contacted the Student and Parents. The Student consistently asked to come back to school. When the Student completed five days of work in a row, School 1 would meet with the family and discuss the Student's returning to school. (P-25, p. 8).

200. The decision for the Student to complete work at home was the result of an incident on April 4, 2018. The Student asked for help and felt a

need to go to partial. The Student tried to open the door at School 1 twice to go outside. A teacher blocked the door and got the Student to sit and wait for the Parents. The Student complained her stomach hurt and she did not feel well. [The Student did not improve during the day, and the Parents picked the Student up from school]. (P-25, p. 8).[10]

201. On May 7, 2018, School 1 staff met with the Parents and decided that the Student would come in the evenings after school was over to complete schoolwork and receive help from a tutor. The Student attended the scheduled tutoring inconsistently in the evenings during the month of May. The number of hours of attendance varied, and the Student completed very little academic work. (P-25, p. 9).

202. On June 4, 2018, the Parent called School 1 to report that that the Student could no longer attend. (P-25, p. 9).

203. The Student received As and Bs on the Quarter 2 report card from School 1, Cs and one D on the Quarter 3 report card, and Incompletes in all subjects for the Quarter 4 report card. (P-24, pp. 1-3).

### *Stipulations About the Therapeutic Placement*

The Parents amended their Complaint to remove the claim for reimbursement for this placement. The parties include the below information strictly for chronological purposes and to provide background for the timeline of J.S.'s placements.

204. The Student attended a therapeutic, residential placement for treatment from July 24, 2018 through August 3, 2018. (P-29, p. 1).

---

[10] P-25 reports many similar incidents prior to April 4, 2018.

205. The therapeutic placement is a primary treatment program that provides clients with intensive individual and family therapy, clinical group and experiential therapy, and approximately 20 hours of school per week. (P-45, P. 1).

206. Upon enrollment, a BioPsychoSocial Intake was completed. (P-43, pp. 7-15).

207. The Student reported suicidal behavior and self-harming behavior. The Student presented as depressed and quiet with minimal energy. (P-43, pp. 13-15).

208. It was noted that during the mental status exam, the Student appeared tired, was hard to engage in the interview, appeared sedated and unfocused, and asked for questions to be repeated numerous times. The Student's speech was slow and vague. The Student's mood was depressed with hopelessness, boredom, anhedonia, and low energy. (P-44, pp. 2-3).

209. On July 27, 2018, a LCSW who acted as the primary therapist at the therapeutic placement authored a letter detailing why the Student required a therapeutic, residential school setting. (P-45).

210. In the letter, it is noted that the Student was observed to struggle with impulsive verbal aggression towards staff and peers when [frustrated] or [when not receiving attention quickly]. (P-45, p. 1).

211. The team at the therapeutic program recommended a therapeutic, residential school setting to meet the Student's "unique educational needs." The LCSW indicated a residential school placement was necessary for the Student to access an education and make educational progress, and that the Student had difficulty making

progress in a less restrictive environment. This was recommended due to the ability of staff to "promote positive social engagement with peers and adults and assist … in building healthy relationships" in a residential school setting. (P-45, p. 1).

212. Additionally, the LCSW stated that "in such a setting, staff are available and can assist with homework and support acquisition of organizational and executive functioning skills. The residential '24-7' environment permits staff to intervene, to support in peer engagement, to ward off any manipulation, to assist with aligning [the Student's] affect with [the Student's] statements, and to identify stressors that provoke anxiety and depression." (P-45, p. 1).

213. The LCSW also noted that "Staff and teachers being available nearly around the clock will have an important role in encouraging and supporting [the Student's] academic progress, positive social reengagement, and recovery from frustration, avoidance, and anxiety." (P-45, p. 2).

214. The Parents identified a residential school in, and hired a specialized company to transport the Student from the therapeutic placement to a residential school. (P-46, p. 1).

### *School 2*

Findings in this sub-section are mine, not the parties' stipulations.

215. School 2 is located in Utah. School 2 provides a small, therapeutic setting. The Student receives 5.5 hours of academic instruction, an hour of elective classes, and a half hour of study hall per day. (N.T. 131).

216. School 2 is accredited with the Utah State Board of Education, as well as nationally accredited through a private organization. (N.T. 132-133). The academic program leads to a high school diploma or GED. (N.T. 133). All of the teachers at School 2 have current teaching licenses through the state of Utah. (N.T. 133).

217. School 2 coordinates the academic, residential, and clinical departments of its program through monthly meetings. (N.T. 133-134).

218. When the Student first arrived at School 2, the Student avoided school and had an extremely short attention span. (N.T. 135-136).

219. School 2 provided multiple accommodations, including: one-on-one assistance through a tutor who would sit directly next to the Student in each academic class, shortened assignments, extra time on assignments, adapted materials, and positive reinforcement. (N.T. 136-137). The Student also received a high level of around-the-clock therapeutic support.

220. School 2 runs two programs. The first program is highly structured all day long. The second program is somewhat less structured, giving students more choice and unstructured time. The Student started in School 2 in the highly structured program and then moved to the less structed program. The decision to change the Student's program was a function of the Student's behavioral improvement, academic success, participation in the program, and completion of initial program goals. (N.T. 154-156).

221. While attending School 2, the Student has had no attendance issues, participates in class, asks for assistance, and no longer requires a tutor. (N.T. 157-158)

222.   The Student completed all of courses for the 2018-2019 school year, earning 5.5 credits, and attaining a 3.01 grade point average. (N.T. 158- 159).

## Witness Credibility

During a due process hearing, the hearing officer is charged with the responsibility of judging the credibility of witnesses, and must make "express, qualitative determinations regarding the relative credibility and persuasiveness of the witnesses." *Blount v. Lancaster-Lebanon Intermediate Unit*, 2003 LEXIS 21639 at *28 (2003). One purpose of an explicit credibility determination is to give courts the information that they need in the event of judicial review. *See, D.K. v. Abington School District*, 696 F.3d 233, 243 (3d Cir. 2014) ("[Courts] must accept the state agency's credibility determinations unless the non-testimonial extrinsic evidence in the record would justify a contrary conclusion."). S*ee also, generally David G. v. Council Rock School District*, 2009 WL 3064732 (E.D. Pa. 2009); *T.E. v. Cumberland Valley School District*, 2014 U.S. Dist. LEXIS 1471 *11-12 (M.D. Pa. 2014); *A.S. v. Office for Dispute Resolution (Quakertown Community School District)*, 88 A.3d 256, 266 (Pa. Commw. 2014); *Rylan M. v Dover Area Sch. Dist.*, No. 1:16-CV-1260, 2017 U.S. Dist. LEXIS 70265 (M.D. Pa. May 9, 2017).

I find no issue with any witnesses' credibility as all witnesses testified honestly and to the best of his or her ability. To the extent any witnesses' testimony conflicts with another's, those witness either recall events differently or have different opinions. To the extent that my findings of fact depend on accepting one witnesses testimony over another's, I have accorded more weight to the witness based on the witnesses' testimony and the other evidence presented.

## Legal Principles

### *The Burden of Proof*

The burden of proof, generally, consists of two elements: the burden of production and the burden of persuasion. In special education due process hearings, the burden of persuasion lies with the party seeking relief. *Schaffer v. Weast*, 546 U.S. 49, 62 (2005); *L.E. v. Ramsey Board of Education*, 435 F.3d 384, 392 (3d Cir. 2006). The party seeking relief must prove entitlement to its demand by preponderant evidence and cannot prevail if the evidence rests in equipoise. *See N.M., ex rel. M.M. v. The School Dist. of Philadelphia*, 394 Fed.Appx. 920, 922 (3rd Cir. 2010), *citing Shore Reg'l High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004). In this particular case, the parents are the party seeking relief and must bear the burden of persuasion.

### *Free Appropriate Public Education (FAPE)*

The IDEA requires the states to provide a "free appropriate public education" to all students who qualify for special education services. 20 U.S.C. §1412. Local education agencies, including school districts, meet the obligation of providing a FAPE to eligible students through development and implementation of IEPs, which must be "'reasonably calculated' to enable the child to receive 'meaningful educational benefits' in light of the student's 'intellectual potential.'" *Mary Courtney T. v. School District of Philadelphia*, 575 F.3d 235, 240 (3d Cir. 2009) (citations omitted). Substantively, the IEP must be responsive to each child's individual educational needs. 20 U.S.C. § 1414(d); 34 C.F.R. § 300.324.

This long-standing Third Circuit standard was confirmed by the United States Supreme Court in *Endrew F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988 (2017). The *Endrew F.* case was the Court's first consideration of the

substantive FAPE standard since *Board of Educ. of Hendrick Hudson Central School District v. Rowley*, 458 U.S. 176, 206-07, 102 S.Ct. 3034 (1982).

In *Rowley*, the Court found that a LEA satisfies its FAPE obligation to a child with a disability when "the individualized educational program developed through the Act's procedures is reasonably calculated to enable the child to receive educational benefits." *Id* at 3015.

Before *Endrew*, the Third Circuit interpreted *Rowley* to mean that the "benefits" to the child must be meaningful, and the meaningfulness of the educational benefit must be relative to the child's potential. *See T.R. v. Kingwood Township Board of Education*, 205 F.3d 572 (3rd Cir 2000); *Ridgewood Bd. of Education v. N.E.*, 172 F.3d 238 (3rd Cir. 1999); *S.H. v. Newark*, 336 F.3d 260 (3rd Cir. 2003). In substance, the holding in *Endrew F.* is no different.

A school district is not required to maximize a child's opportunity; it must provide a basic floor of opportunity. *See, Lachman v. Illinois State Bd. of Educ.*, 852 F.2d 290 (7th Cir.), *cert. denied*, 488 U.S. 925 (1988). However, the meaningful benefit standard required LEAs to provide more than "trivial" or "*de minimus*" benefit. *See Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171, 1179 (3d Cir. 1998), *cert. denied* 488 U.S. 1030 (1989). *See also Carlisle Area School v. Scott P.*, 62 F.3d 520, 533-34 (3d Cir. 1995). It is well-established that an eligible student is not entitled to the best possible program, to the type of program preferred by a parent, or to a guaranteed outcome in terms of a specific level of achievement. *See, e.g., J.L. v. North Penn School District*, 2011 WL 601621 (E.D. Pa. 2011). Thus, what the statute guarantees is an "appropriate" education, "not one that provides everything that might be thought desirable by 'loving parents.'" *Tucker v. Bayshore Union Free School District*, 873 F.2d 563, 567 (2d Cir. 1989).

38

In *Endrew F.*, the Supreme Court effectively agreed with the Third Circuit by rejecting a "merely more than *de minimus*" standard, holding instead that the "IDEA demands more. It requires an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. 988, 1001 (2017). Appropriate progress, in turn, must be "appropriately ambitious in light of [the child's] circumstances." *Id* at 1000. In terms of academic progress, grade-to-grade advancement may be "appropriately ambitious" for students capable of grade-level work. *Id*. Education, however, encompasses much more than academics. Grade-to-grade progression is not an absolute indication of progress even for an academically strong child, depending on the child's circumstances.

In sum, the essence of the standard is that IDEA-eligible students must receive specially designed instruction and related services, by and through an IEP that is reasonably calculated at the time it is issued to offer an appropriately ambitious education in light of the Student's circumstances.

### *Compensatory Education*

Compensatory education is an appropriate remedy where a LEA knows, or should know, that a child's educational program is not appropriate or that he or she is receiving only a trivial educational benefit, and the LEA fails to remedy the problem. *M.C. v. Central Regional Sch. District*, 81 F.3d 389 (3d Cir. 1996). Compensatory education is an equitable remedy. *Lester H. v. Gilhool*, 916 F.2d 865 (3d Cir. 1990).

Courts in Pennsylvania have recognized two methods for calculating the amount of compensatory education that should be awarded to remedy substantive denials of FAPE. The first method is called the "hour-for-hour" method. Under this method, students receive one hour of compensatory

education for each hour that FAPE was denied. *M.C. v. Central Regional*, arguably, endorses this method.

The hour-for-hour method has come under considerable scrutiny. Some courts outside of Pennsylvania have rejected the hour-for-hour method outright. *See Reid ex rel.Reid v. District of Columbia*, 401 F.3d 516, 523 (D.D.C. 2005). In *Reid*, the court conclude that the amount and nature of a compensatory education award must be crafted to put the student in the position that she or he would be in, but for the denial of FAPE. *Reid* is the leading case on this method of calculating compensatory education, and the method has become known as the *Reid* standard or *Reid* method.

The more nuanced *Reid* method was endorsed by the Pennsylvania Commonwealth Court in *B.C. v. Penn Manor Sch. District*, 906 A.2d 642, 650-51 (Pa. Commw. 2006) and the United States District Court for the Middle District of Pennsylvania in *Jana K. v. Annville Cleona Sch. Dist.*, 2014 U.S. Dist. LEXIS 114414 (M.D. Pa. 2014). It is arguable that the Third Circuit also has embraced this approach in *Ferren C. v. Sch. District of Philadelphia*, 612 F.3d 712, 718 (3d Cir. 2010) (quoting *Reid* and explaining that compensatory education "should aim to place disabled children in the same position that the child would have occupied but for the school district's violations of the IDEA.").

Despite the clearly growing preference for the *Reid* method, that analysis poses significant practical problems. In administrative due process hearings, evidence is rarely presented to establish what position the student would be in but for the denial of FAPE – or what amount or what type of compensatory education is needed to put the student back into that position. Even cases that express a strong preference for the "same position" method recognize the importance of such evidence, and suggest that hour-for-hour is the default when no such evidence is presented:

40

"… the appropriate and reasonable level of reimbursement will match the quantity of services improperly withheld throughout that time period, unless the evidence shows that the child requires more or less education to be placed in the position he or she would have occupied absent the school district's deficiencies."

*Jana K. v. Annville Cleona Sch. Dist.,* 2014 U.S. Dist. LEXIS 114414 at 36-37.

Finally, there are cases in which a denial of FAPE creates a harm that permeates the entirety of a student's school day. In such cases, full days of compensatory education (meaning one hour of compensatory education for each hour that school was in session) are warranted. Such awards are fitting if the LEA's "failure to provide specialized services permeated the student's education and resulted in a progressive and widespread decline in [the Student's] academic and emotional well-being" *Jana K. v. Annville Cleona Sch. Dist.*, 2014 U.S. Dist. LEXIS 114414 at 39. See also *Tyler W. ex rel. Daniel W. v. Upper Perkiomen Sch. Dist.*, 963 F. Supp. 2d 427, 438-39 (E.D. Pa. Aug. 6, 2013); *Damian J. v. School Dist. of Phila.*, Civ. No. 06-3866, 2008 WL 191176, *7 n.16 (E.D. Pa. Jan. 22, 2008); *Keystone Cent. Sch. Dist. v. E.E. ex rel. H.E.*, 438 F. Supp. 2d 519, 526 (M.D. Pa. 2006); *Penn Trafford Sch. Dist. v. C.F. ex rel. M.F.*, Civ. No. 04-1395, 2006 WL 840334, *9 (W.D. Pa. Mar. 28, 2006); *M.L. v. Marple Newtown Sch. Dist.*, ODR No. 3225-11-12-KE, at 20 (Dec. 1, 2012); *L.B. v. Colonial Sch. Dist.*, ODR No. 1631-1011AS, at 18-19 (Nov. 12, 2011).

Whatever the calculation, in all cases compensatory education begins to accrue not at the moment a child stopped receiving a FAPE, but at the moment that the LEA should have discovered the denial. *M.C. v. Central Regional Sch. District*, 81 F.3d 389 (3d Cir. 1996). Usually, this factor is

stated in the negative – the time reasonably required for a LEA to rectify the problem is excluded from any compensatory education award. *M.C. v. Central Regional Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. N.J. 1996)

In sum, I subscribe to the logic articulated by Judge Rambo in *Jana K. v. Annville Cleona*. If a denial of FAPE resulted in substantive harm, the resulting compensatory education award must be crafted to place the student in the position that the student would be in but for the denial. However, in the absence of evidence to prove whether the type or amount of compensatory education is needed to put the student in the position that the student would be in but for the denial, the hour-for-hour approach is a necessary default. Full-day compensatory education can also be awarded if that standard is met. In any case, compensatory education is reduced by the amount of time that it should have taken for the LEA to find and correct the problem.

### *Child Find*

The IDEA's Child Find provision requires states to ensure that "all children residing in the state who are disabled, regardless of the severity of their disability, and who are in need of special education and related services are identified, located and evaluated." 20 U.S.C. 1412(a)(3). This provision places upon school districts the "continuing obligation . . . to identify and evaluate all students who are reasonably suspected of having a disability under the statutes." *P.P. ex rel. Michael P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 738 (3d Cir. 2009); *see also* 20 U.S.C. § 1412(a)(3). The evaluation of children who are suspected to be learning disabled must take place within a reasonable period of time after the school is on notice of behavior that is likely to reflect a disability. *Ridgewood Bd. of Educ. v. N.E.*, 172 F.3d 238, 250 (3d Cir. 1999). The failure of a school district to timely evaluate a child who it should reasonably suspect of having a learning

disability constitutes a violation of the IDEA, and a denial of FAPE. 20 U.S.C. § 1400.

### Tuition Reimbursement

Hearing Officers use a three-part test to determine whether parents are entitled to reimbursement for special education services. The test flows from *Burlington School Committee v. Department of Education of Massachusetts*, 471 U.S. 359 (1985) and *Florence County School District v. Carter*, 510 U.S. 7 (1993). This is referred to as the "*Burlington-Carter*" test.

The first step is to determine whether the program and placement offered by the LEA is appropriate for the child. The second step is to determine whether the program obtained by the parents is appropriate for the child. The third step is to determine whether there are equitable considerations that merit a reduction or elimination of a reimbursement award. *Lauren W. v. DeFlaminis*, 480 F.3d 259 (3rd Cir. 2007). The steps are taken in sequence, and the analysis ends if any step is not satisfied.

### Section 504/Chapter 15

At the outset, it must be noted that an LEA may completely discharge its duties to a student under Section 504 by compliance with the IDEA. Consequently, when a Student is IDEA-eligible, and the LEA satisfies its obligations under the IDEA, no further analysis is necessary to conclude that Section 504 is also satisfied. Conversely, all students who are IDEA-eligible are protected from discrimination and must have access to school programming in all of the ways that Section 504 ensures.

"Eligibility" under Section 504 is a colloquialism – the term does not appear in the law. That term is used as shorthand for the question of whether a

43

person is protected by Section 504. Section 504 protects "handicapped persons," a term that is defined at 34 CFR § 104.3(j)(1):

> Handicapped persons means any person who (i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

Chapter 15 applies Section 504 in schools to prohibit disability-based against children who are "protected handicapped students." Chapter 15 defines a "protected handicapped student" as a student who:

1. Is of an age at which public education is offered in that school district; and

2. Has a physical or mental disability which substantially limits or prohibits participation in or access to an aspect of the student's school program; and

3. Is not IDEA eligible.

*See* 22 Pa. Code § 15.2.

Chapter 15 goes on to delineate the substantive and procedural protections that LEAs must provide to protected handicapped students who are not IDEA eligible. In this case, both parties agree that the Student is IDEA eligible, and so those provisions are not applicable.

In this context, there is some question as to whether ODR hearing officers have authority to decide Section 504 intentional discrimination claims. ODR hearing officers have no direct authority to hear claims arising under Section 504 itself. Rather, ODR hearing officers have authority to hear claims arising under Chapter 15. For example, if a child is a protected handicapped student

44

but not IDEA-eligible, an ODR hearing officer can resolve disputes concerning the child's Service Agreement (the plan through which regular education accommodations are provided to ensure access to the curriculum).

Having considered the issue, other Hearing Officers have concluded that ODR hearing officers have authority to hear intentional discrimination claims arising under Section 504. *See e.g. C.L. v. Mars Area Sch. Dist.,* ODR No. 16696 (2016); *C.B. v. Boyertown Area Sch. Dist.,* ODR No. 16749 (2016); *J.C. v. Greensburg Salem Sch. Dist.,* ODR 19230-1617AS (2018). There is support for this conclusion in Chapter 15 itself, which is intended to ensure complacence with Section 504. *See, e.g.* 22 Pa. Code § 15.1, relating to 34 C.F.R. Part 104. I reach the same conclusion as my colleagues.

Intentional discrimination under Section 504 requires a showing of deliberate indifference, which may be met by establishing "both (1) knowledge that a federally protected right is substantially likely to be violated ... and (2) failure to act despite that knowledge." *S.H. v. Lower Merion School District*, 729 F.3d 248, 265 (3d Cir. 2013). However, "deliberate choice, rather than negligence or bureaucratic inaction" is necessary to support such a claim. *Id.* at 263.

The knowledge element was absent in *S.H.* Consequently, the Court did not go on to discuss the alleged failure to act. *Id.* More recently, the Third Circuit addressed the failure to act element in *School District of Philadelphia v. Kirsch*, 71 IDELR 123, 722 F. App'x 215 (3d Cir. 2018). In *Kirsch*, a school district did not inform parents that it had a policy of not holding IEP meetings or responding to email in the summer. Parents claimed that the school district's failure to inform them of the policy constituted deliberate indifference. The *Kirsch* court found no evidence that the failure to inform was a deliberate choice, and so it rejected the claims.

As such, I must determine if the District discriminated against the Student on the basis of the Student's disability in violation of Section 504. I must also determine if the District acted with deliberate indifference under the standards set forth in *S.H.* and *Kirsch.*

## Discussion

### *Compensatory Education*
### *January 28, 2017 – November 28, 2017*

The Parents revoked consent for special education on November 5, 2012. The IDEA shields LEAs from FAPE claims when Parents revoke consent. *See* 20 U.S.C. § 1414. The IDEA does not specify how long that protection lasts. Moreover, the connection between revoked consent and an LEA's Child Find obligations are unclear.

In this case, the District was concerned enough about the Student that it sought the Parents' consent to re-evaluate the Student in December 2015, and March 2016 (7th grade). On both occasions, the Parents withheld consent. As with consent revocation, the IDEA shields LEAs from FAPE claims when Parents refuse consent for evaluations. *See* 20 U.S.C. § 1414. Moreover, by the end of the 2015-16 school year, the Parents had removed the Student from special education and affirmatively withheld consent for special education and evaluations three times.

At the start of the 2016-17 school year, however, the Student's behavior had not improved, and the District learned about the Student's arm cutting and suicidal ideation. The parties stipulate that the District had enough information about the Student's metal state to complete a suicide risk assessment and refer the Student to a crisis center. This, unsurprisingly,

46

sparked an internal discussion about the Student at the District as teachers and counselors attempted to organize supports.

By January 2017, the District had actual knowledge of the Student's poor academic performance and of the Student's emotionality and inattentive behaviors in school. The District also completed assessment forms for outside providers around this time. The District also had actual knowledge of the Student's partial hospitalization in early February 2017. All of this prompted the District to again seek the Parents' consent to evaluate the Student on February 20, 2017.

For the period from January 28 to February 20, 2017, I find that the District was shielded from FAPE claims as a result of the Parent's prior revocation of consent for special education services and evaluations. Moreover, the information that the District obtained about the student from the start of the 2016-17 school year through February 2017, triggered the District's Child Find obligation. That obligated the District to request an evaluation, which is what the District did.

The District sought the Parent's consent to evaluate on February 20, 2017. The Parents provided consent, and the District completed the evaluation report (ER) on April 30, 2017. The District concluded that the Student did not have a disability and was ineligible for special education. Although I must not substitute my own judgement for the District evaluators, evidence in this case is more than preponderant that the District reached its conclusion by cherry-picking data. The District relied upon the most positive behavior rating scales, discounted negative rating scales, failed to solicit more information when rating scales could not be completed, and completely ignored narrative input from teachers suggesting problems in school.

At best, the District was obligated to conclude that more information was necessary. I find, however, that the District's evaluation was inappropriate because it discounted or ignored information establishing that the Student was a child with a disability. From this point forward, the Student is protected as a thought-to-be eligible student.

The fact that the Parents approved the District's NOREP finding no eligibly is no defense. It is well-established that the Student's right to FAPE is not predicated upon the Parents vigilance or lack thereof.

The Student received no special education from April 30, 2017 through the end of the 2016-17 school year. During this time, the Student had the same rights and protections as an eligible child. The Student's behavioral presentation negatively impacted the Student throughout the entirety of the school day resulting in, *inter alia*, poor academic performance (again, the teacher's narrative input in the evaluation is telling). I award full days of compensatory education for each day that school was in session from January 28, 2017 through the end of the 2016-17 school year.

This denial of FAPE continued into the 2017-18 school year until September 27, 2017. At that time, the Student's condition had deteriorated, absenteeism was a bigger problem, and the District gained more information about the mental health services the Student was receiving. These changes and new information again triggered the District's Child Find obligations and again the District sought consent for an evaluation. When that form was not returned, the District sought consent again on November 11, 2017. The Parents did not provide consent until February 6, 2018 – after the Student was attending School 1.

It is difficult to fault the Parents for not responding to the District's efforts to evaluate the Student. The Student was in crisis, unable to come to school,

unable to do schoolwork, and moving from hospital to hospital. But the District was not indifferent to the Student's needs at this time. The District took the action that the law required by seeking the Parents' consent to evaluate. The District could not evaluate until it had the Parents' consent.[11] As noted above, in the absence of parental consent, the District cannot be liable for its failure to evaluate (despite the fact that the Student would have been identified but for the District's flawed 2017 evaluation). The District cannot be responsible for a denial of FAPE from September 27, 2017, through November 28, 2017.

### *Tuition Reimbursement, School 1*

The first prong of the *Burlignton-Carter* test is satisfied in this case by preponderant evidence. The District's 2017 evaluation was fundamentally flawed. As a result, the Student was not identified as a child with a disability. The Student should have been identified at that time and was owed a FAPE at the time that the Parents sent the Student to School 1.

Above, I discuss that the Parents' failure to return consent forms in September and November 2017 shield the District from denial of FAPE claims as a matter of law. However, the District's inability to evaluate the Student from September 27, 2017 through the Student's placement in School 1 does not shield the District from the Parent's tuition reimbursement claim. The fact that the District could not conduct a new evaluation in September 2017 after finding the Student ineligible in April 2017 does not change the fact that the Student was a child with a disability the whole time. Had the District offered an IEP to the Student in April 2017, the result may

---

[11] The District also had the option of requesting a due process hearing to override parental consent requirement, but the District was not obligated to request such a hearing.

be different. As it stands, the Student was a child with a disability but with no IEP at the time that the Parents enrolled the Student in School 1.

The Parents, however, have not satisfied the second prong of the *Burlington-Carter* test. There is no evidence in the record that School 1 was appropriate for the Student. Rather, the parties' stipulations illustrate that the Student continued to deteriorate the whole time that the Student attended School 1. Exhibit P-25 is critical. The findings above compress a substantial number of stipulations flowing from P-25, which is a compilation of notes from School 1. The Student's absenteeism increased, the Student's mental state worsened, and School 1 was unable to safely educate the Student. There is no evidence that School 1 was calculated to provide any educational benefit to the Student even under the lower standard used in the *Burlington-Carter* test. Further, even if the Parents were somehow led to believe that School 1 could be successful, the serious and escalating problems that the Student experienced in School 1 almost immediately upon enrollment would have compelled any reasonable parent to reconsider the appropriateness of School 1's program. The Parents decision to keep the Student in School 1 through early June 2018 is difficult to understand.

As the Parents have not satisfied the second prong of the *Burlington-Carter* test, tuition reimbursement analysis for School 1 stops. The Parents are not entitled to tuition reimbursement for School 1.

### Tuition Reimbursement, School 2

While attending School 1, the District evaluated the Student, found that the Student was a child with a disability, and offered an IEP.[12] I consider the

---

[12] The stipulations describe the NOREP through which the District offered the IEP as a "draft" NOREP. The parties' briefs clarify, however, that both parties view the 2018 IEP as the District's FAPE offer.

2018 IEP to determine if the District offered a FAPE prior to the Student's enrollment in School 2.

The 2018 IEP was inappropriate. At the time that the District drafted the 2018 IEP, the District had concluded through an evaluation the Student was a child with an emotional disturbance. The District based its conclusion in the evaluation on its findings that on the Student's inability to build or maintain relationships, inappropriate behaviors or feelings, pervasive mood/depression and physical symptoms and fears. The District also had all of the input from School 1 staff concerning the Student's need for 1:1 support, attendance issues, and inability to complete work as a result of the Student's mental state. The parties agree that the District did not have a complete picture of the Student's presentation in School 1, but I cannot understand how the District concluded in the IEP that the Student did *not* exhibit behaviors that impede his/her learning or that of others.

Moreover, the 2018 IEP proposes, for the most part, strategies that were ineffective prior to the Student's enrollment in School 1, or that were proving ineffective in School 1. Worse, the IEP's single goal is barely comprehensible, let alone measurable or objective. Giving the District the benefit of the doubt, a generous reading of the goal requires the Student to complete all five sub-goals, completing each sub-goal with 75% accuracy, on four out of five days. Even under a generous reading, the goal is not objective and not related to the Student's needs (or, even more generously, target only a tiny fraction of the Student's needs).

Even if that goal is appropriate (it is not) the SDI and modifications provided in the IEP are not connected to the goal. There is nothing in the IEP that is reasonably calculated to enable the Student to "1. Access electronic grade-book to determine outstanding assignments, 2. Identify upcoming assignments, projects or assessments, 3. Develop a plan of study for

51

resource class, 4. Share the plan with resource teacher, and 5. Complete the plan of study during resource period…" All of the self-monitoring strategies in the world will not teach the Student how to develop a study plan. The IEP was not reasonably calculated to enable the Student to reach its own insufficient, inappropriate goal – let alone reasonably calculated to provide a FAPE. The first prong of the *Burlington-Carter* test is satisfied.

School 2 is appropriate under the second prong of the *Burlington-Carter* test. At the time of the Student's transition to School 2, preponderant evidence supports the need for an intensive, residential, therapeutic program with a significant academic program. School 2 is such a program.

Evidence of the Student's need for a therapeutic program is more than preponderant. The Student's educational difficulties are, in large part, a function of the Student's emotional disturbance. At the time of enrollment, that emotional disturbance was so elevated that the Parents could not make the Student to attend school. In the leadup to the placement in School 2, the Student's emotional disturbance made it both difficult for the Student to remain in school and created multiple dangerous situations in school, resulting in the Student's frequent removal (again, P-25 is critical). The Student required a residential placement so that the Student could remain in a therapeutic/educational setting. It is striking that as soon as the Student entered a residential setting where acting out was decoupled from going home, attendance and elopement issues were quickly quelled. School 2 is appropriate under the *Burlington-Carter* standard and the second prong of that test is satisfied.

The District argues that tuition reimbursement must be reduced or eliminated in the third prong of the *Burlington-Carter* test upon consideration of equitable factors. First, the District argues that the Parents' first request for tuition reimbursement came in their complaint on January

28, 2019. The District also asks me to consider the Parents' failure to consent to evaluations. I agree that the Parents could have shared more information with the District, but I do not reduce the reimbursement award.

The District's argument is primally based in 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb), which requires parents to give LEAs 10 business days' notice of their intent to place children in private schools and seek reimbursement. The law exists to give LEAs an opportunity to correct problems before either party incurs a risk of loss.

I agree that the Parents did not provide 10 days' notice, and that factors excusing the notice requirement prior to placement in School 2 are not met. The IDEA, however, does not require a reduction or elimination of remedies in such cases. Rather, the IDEA says that reimbursement "may be reduced or denied." I find no reason to reduce or deny tuition reimbursing in this case. The District evaluated the Student prior to placement in School 2, ignored information in its own evaluation, and drafted an inappropriate IEP. Faced with that inappropriate IEP and a child in crisis, the Parent's failure to provide 10 days' notice does not mitigate against reimbursement under the unique facts of this case.

The District's argument about consent to evaluate is similarly unavailing. The District evaluated the Student and offered an IEP before the Student enrolled in School 2. The Parents certainly could have been more forthcoming and helpful in the development of the 2018 IEP, but none of the Parents' actions abrogated the District's obligation to offer a FAPE to the Student. The third prong of the *Burlington-Carter* test does not result in reduced tuition reimbursement.

Despite the foregoing, there is nothing in the record establishing that School 2 is only residential school that is appropriate for the Student. There is no

evidence that the Parents sought similar schools locally, or even within Pennsylvania. The District owes the Parents reimbursement for tuition, room, and board. The District does not owe the Parents reimbursement for related expenses such as transportation (airfare and the like).

### *Deliberate Indifference*

I do not find that the District acted with deliberate indifference at any time discussed herein. As discussed above, deliberate indifference is a component of intentional discrimination. As such, it is proven by something more than a denial of FAPE.

Applied to this case, it is true that the District did not act on all of the information it obtained through its evaluation. It is also true that the Parents did not share the full extent of the Student's problems with the District. Even so, there is no evidence that the District made a choice to ignore information, knowing that choice was substantially likely to result in a violation of the Student's rights. Nothing in the record establishes that the District's failures were a deliberate choice, as opposed to negligence or bureaucratic inaction.

### ORDER

Now, November 18, 2019, it is hereby ORDERED as follows:

1. I award the Student full days of compensatory education for each day that the District was in session from April 30, 2017 through September 27, 2017. Compensatory education may take the form of any appropriate developmental, remedial or enriching educational service, product or device that furthers Student's educational and related services needs. Compensatory education shall be in addition to, and shall not be used to supplant, educational and related services that should appropriately be provided by the School through Student's IEP

to assure meaningful educational progress. Compensatory education may not be used for anything that is primarily recreational in nature. Compensatory services may occur after school hours, on weekends, and/or during the summer months when convenient for Student and the Parents. The hours of compensatory education may be used at any time from the present until Student turns age twenty-one (21). Services and goods purchased with compensatory education may not exceed the market rate in the District's geographical area.

2. The Student is not entitled to compensatory education for any other period of time considered in this matter.

3. The Parents are not entitled to tuition reimbursement for the Student's placement in School 1.

4. The Parents are entitled to tuition reimbursement for the Student's placement in School 2. As applied in this case, tuition reimbursement includes tuition, room, and board, but does not include related costs such as transportation.

5. To the extent that the District violated the Student's rights under the IDEA or Section 504, it did not do so with deliberate indifference.

It is **FURTHER ORDERED** that any claim not specifically addressed in this order is **DENIED** and **DISMISSED.**

/s/ Brian Jason Ford
HEARING OFFICER

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**

North Allegheny School District

**(b)** County of Residence of First Listed Plaintiff   Allegheny
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Christina L. Lane, Maiello Brungo & Maiello
424 South 27th Street, Suite 210
Pittsburgh, PA 15203

**DEFENDANTS**

J.S. a minor, by her parents K. S. and B.S.

County of Residence of First Listed Defendant   Allegheny
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Kristen Weidus, Ruder Law
429 Forbes Avenue, Suite 450
Pittsburgh, Pa 15219

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government
       Plaintiff
- ☒ 3  Federal Question
       *(U.S. Government Not a Party)*
- ☐ 2  U.S. Government
       Defendant
- ☐ 4  Diversity
       *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)* and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*                                    Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury  - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| | | | | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| | | | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement Income Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 950 Constitutionality of State Statutes |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☒ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

**V. ORIGIN** *(Place an "X" in One Box Only)*

- ☒ 1  Original Proceeding
- ☐ 2  Removed from State Court
- ☐ 3  Remanded from Appellate Court
- ☐ 4  Reinstated or Reopened
- ☐ 5  Transferred from Another District *(specify)*
- ☐ 6  Multidistrict Litigation - Transfer
- ☐ 8  Multidistrict Litigation - Direct File

**VI. CAUSE OF ACTION**

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
VI Cause of Action 42 U.S.C. 1400 (IDEA)
Brief description of cause:
Plaintiff seeks reversal of administrative decision awarding compensatory education and tuition reimbursement

**VII. REQUESTED IN COMPLAINT:**

- ☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
JURY DEMAND:   ☐ Yes   ☒ No

**VIII. RELATED CASE(S) IF ANY**

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE
02/14/2020

SIGNATURE OF ATTORNEY OF RECORD
Christina L. Lane

**FOR OFFICE USE ONLY**

RECEIPT #_____   AMOUNT_____   APPLYING IFP_____   JUDGE_____   MAG. JUDGE_____

Print        Save As...        Reset

JS 44A REVISED June, 2009
IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF PENNSYLVANIA
THIS CASE DESIGNATION SHEET MUST BE COMPLETED

**PART A**

This case belongs on the ( ◯ Erie   ◯ Johnstown   ◉ Pittsburgh) calendar.

1. **ERIE CALENDAR -** If cause of action arose in the counties of Crawford, Elk, Erie, Forest, McKean. Venang or Warren, OR any plaintiff or defendant resides in one of said counties.

2. **JOHNSTOWN CALENDAR -** If cause of action arose in the counties of Bedford, Blair, Cambria, Clearfield or Somerset OR any plaintiff or defendant resides in one of said counties.

3. Complete if on **ERIE CALENDAR:** I certify that the cause of action arose in_____ County and that the _____resides in_____County.

4. Complete if on **JOHNSTOWN CALENDAR:**  I certify that the cause of action arose in _____County and that the_____resides in _____County.

**PART B** (You are to check ONE of the following)

1. ◯ This case is related to Number_____ . Short Caption_____.

2. ◉ This case is not related to a pending or terminated case.

DEFINlTIONS OF RELATED CASES:

CIVIL:  Civil cases are deemed related when a case filed relates to property included in another suit or involves the same issues of fact or it grows out of the same transactions as another suit or involves the validity or infringement of a patent involved in another suit EMINENT DOMAIN:  Cases in contiguous closely located groups and in common ownership groups which will lend themselves to consolidation for trial shall be deemed related.
HABEAS CORPUS & CIVIL RIGHTS:  All habeas corpus petitions filed by the same individual shall be deemed related. All pro se Civil Rights actions by the same individual shall be deemed related.

**PARTC**

I. CIVIL CATEGORY (Select the applicable category).

    1. ◯   Antitrust and Securities Act Cases

    2. ◯   Labor-Management Relations

    3. ◯   Habeas corpus

    4. ◉   Civil Rights

    5. ◯   Patent, Copyright, and Trademark

    6. ◯   Eminent  Domain

    7. ◯   All  other federal question cases

    8. ◯   All  personal  and property damage tort cases,  including  maritime,  FELA, Jones Act, Motor vehicle, products liability, assault, defamation,  malicious prosecution, and false arrest

    9. ◯   Insurance indemnity, contract and other diversity cases.

   10.◯   Government Collection Cases (shall include HEW Student Loans (Education), V A  0verpayment, Overpayment of Social Security, Enlistment Overpayment (Army, Navy, etc.),  HUD Loans, GAO Loans (Misc. Types), Mortgage Foreclosures, SBA Loans, Civil Penalties and Coal Mine Penalty and Reclamation Fees.)

I certify that to the best of my knowledge the entries on this Case Designation Sheet are true and correct

Christina L. Lane

Date: 2/14/2020 _____      _____

                                                          ATTORNEY AT LAW

NOTE: ALL SECTIONS OF BOTH FORMS MUST BE COMPLETED BEFORE CASE CAN BE PROCESSED.

## INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

**(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

**(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked**. (See Section III below; NOTE: federal question actions take precedence over diversity cases.)**

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket. **PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.